**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| **UNITED STATES ex rel. DAVID** | § | **Civil Action No.: _____** |
| **FLOWERS and JOSEPH LAWRENCE,** | § | |
| | § | |
| **Co-Relators,** | § | **JURY TRIAL DEMAND** |
| | § | |
| **v.** | § | |
| | § | **FILED IN CAMERA** |
| **EXPRESS SCRIPTS, INC.** | § | **AND UNDER SEAL** |
| | § | **PURSUANT TO** |
| **Defendant.** | § | **31 U.S.C. § 3730** |
| | § | |
| | § | **DO NOT ENTER INTO PACER** |
| | § | |
| | § | **DO NOT ENTER IN CM/ECF** |
| | § | |
| | § | **DO NOT PLACE IN PRESS BOX** |

---

**<u>RELATORS' COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT</u>**

TO THE HONORABLE JUDGE OF THE COURT:

  This is an action for the United States of America brought by *qui tam* Relators David

Flowers and Joseph Lawrence, to recover all damages, civil penalties, and other relief for

Express Scripts, Inc.'s violations of the FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *et seq.*

**Table of Contents**

I.     INTRODUCTION ...................................................................................................1

II.    JURISDICTION AND VENUE...........................................................................6

III.   PROCEDURE ........................................................................................................6

IV.    PARTIES ................................................................................................................6

V.     TRICARE CONTRACTED ESI TO ADMINISTER ITS  PHARMACY
       BENEFITS PROGRAM.........................................................................................8

       A.  The Government Contracted ESI to Administer the TRICARE Retail and Mail
           Order Pharmacy Benefits Program.................................................................8

           1.   The TPharm Contract (Awarded in 2008)................................................8

           2.   The Retail Program Under the TPharm Contract...............................11

           3.   The Mail Order Pharmacy Program Under the TPharm Contract ....................15

           4.   The TRRx and TMOP Contracts........................................................15

VI.    THE LAW PROHIBITS TRICARE COST SHARING
       OVER-THE-COUNTER PRODUCTS AND NON-DRUGS.........................17

       A.  The Law......................................................................................................17

       B.  Products Other Than FDA-Unapproved Drugs that ESI Caused TRICARE to
           Cost Chare ...............................................................................................20

VII.   THE REGULATION OF DRUGS AND THE KNOWN  PROBLEM OF FDA-
       UNAPPROVED DRUGS.....................................................................................22

       A.  The Known Problem ...................................................................................24

       B.  Why So Many Unapproved Drugs are in the Market.................................25

       C.  The Evolution of the Regulation of Drugs ................................................26

           1.   The Food, Drug, and Cosmetic Act of 1938 .................................26

           2.   The 1962 Amendments to the FDCA and the DESI Program .........................26

           3.   DESI Notices Apply to Drugs that are "Identical, Related, or Similar"...........27

           4.   Almost No Drugs are Grandfathered ...............................................29

       D.  The FDA's Enforcement Efforts to Remove Unapproved Drugs From the
           Market .......................................................................................................30

           1.   FDA's Compliance Policy Guide.....................................................30

                A.  Enforcement Priorities.......................................................31

           2.   FDA's Unapproved Drugs Initiative ...............................................32

           3.   FDA Enforcement Actions by Drug Class.......................................33

           4.   FDA Enforcement Actions by Firm .................................................33

     5.     False Claims Act Cases Involving Unapproved Drugs ......................................34

     6.     FDA Unapproved Drug Workshop ..................................................................34

VIII.   THE LAW PROHIBITS TRICARE COST SHARING UNAPPROVED DRUGS .........35

   A.  By Law, TRICARE Cannot Cost Share Unapproved Drugs ......................................35

   B.  Contractual Terms Prohibit ESI from Causing TRICARE to Cost Share
       Unapproved Drugs ..................................................................................................39

   C.  The Unapproved Drugs ESI Caused TRICARE to Cost Share ................................40

IX.    ESI'S VIOLATIONS OF THE FALSE CLAIMS ACT ........................................48

   A.  The False Claims Act ..............................................................................................48

   B.  ESI's Violations of the False Claims Act................................................................50

   C.  ESI Knew TRICARE Cannot Cost Share Non Drugs and Unapproved Drugs
       and was Therefore Not Entitled to Government Payment for Dispensing and
       Adjudicating Claims for Such Products ..................................................................54

   D.  ESI Submitted False Invoices to be Reimbursed for Administrative Fees
       Associated With Retail and Mail Prescriptions for Products Which Could Not
       Be Cost Shared by TRICARE ................................................................................58

   E.  ESI's Caused False Claims to Presented to the Government When it Approved
       Claims at Retail for Drugs that Could Not Be Cost Shared by TRICARE ................61

   F.  ESI's Reverse False Claims ...................................................................................61

   G.  ESI Fraudulently Induced the Government to Award it the TPharm Contract ...........62

   H.  ESI Caused Substantial Damage to the Government ...................................................64

IX.    FIRST CAUSE OF ACTION ..................................................................................67

X.     SECOND CAUSE OF ACTION..............................................................................68

XI.    THIRD CAUSE OF ACTION .................................................................................68

XII.   FOURTH CAUSE OF ACTION..............................................................................69

XIII.  FIFTH CAUSE OF ACTION ..................................................................................69

XIV.  SIXTH CAUSE OF ACTION ..................................................................................70

XIX.  PRAYER ................................................................................................................70

XX.   RELATORS' INTEREST ........................................................................................71

XXI.  DEMAND FOR JURY TRIAL ...............................................................................71

APPENDIX A  –  TPharm Contract

APPENDIX B  –  Products Other Than FDA-Unapproved Drugs that ESI Caused
                TRICARE to Cost Share

APPENDIX C –  Unapproved drugs ESI Caused TRICARE to Cost Share

  
# I.     <u>INTRODUCTION</u>

1.      Relators David Flowers and Joseph Lawrence bring this *qui tam* action under the FALSE

CLAIMS ACT for the United States of America and themselves against Defendant Express Scripts,

Inc. (ESI).  ESI is the nation's second largest pharmacy benefits program manager[1] with annual

revenue of over $100 billion.

2.      TRICARE Management Activity (TRICARE) is the health care program for military

service members and their dependents.  In 2008, the United States, acting through TRICARE,

awarded ESI a multibillion-dollar cost-plus reimbursement contract (TPharm).  As TRICARE's

TPharm contractor, ESI administers TRICARE's pharmacy benefits program, which consists of

retail and mail order pharmacy benefit services.  Under TPharm, TRICARE hired ESI to: 1) act

as its fiscal intermediary for its pharmacy benefits program; 2) adjudicate retail pharmacy

claims; 3) use Government funds to pay retail pharmacies their dispensing fees and product cost

for approved claims; and 4) adjudicate and fill mail order prescriptions.  ESI submits invoices to

the Government for performance of these services.

3.       Prior to TPharm, TRICARE awarded ESI two separate contracts to administer its

pharmacy benefits program.  In late 2002, TRICARE awarded ESI the TRICARE Mail Order

Pharmacy contract (TMOP).  In 2003, TRICARE awarded ESI the TRICARE Retail Pharmacy

Services contract (TRRx).  TRICARE consolidated those contracts in 2008 into the TPharm

contract.

4.      TRICARE is a defined benefit plan.  It can only cost share "authorized pharmaceuticals"

or "covered drugs."  The law prohibits TRICARE cost sharing non-drugs such as over-the-

---

[1] *See generally* FEDERAL TRADE COMMISSION, Press Release, FTC Closes Eight-Month Investigation of Express
Scripts, Inc.'s Proposed Acquisition of Pharmacy Benefits Manger Medco Health Solutions, Inc. (Apr. 2, 2012)
(FTC File No. 111-0210) (discussing ESI's $29 billion acquisition of Medco Health Solutions), available at
<http://www.ftc.gov/opa/2012/04/medco.shtm> (last visited Sep. 3, 2012).

counter drugs, medical foods, and supplements.  The law also prohibits TRICARE cost sharing drugs unapproved by the United States Food and Drug Administration (FDA).[2]  That is, Government funds cannot be used to pay for these products because they are not covered benefits under the TRICARE program.  In fiscal year 2011, TRICARE spent over $7 billion on pharmaceuticals.  A substantial percentage of this $7 billion was for products that ESI caused TRICARE to pay for which were ineligible for coverage.

5.     Retail: Under the retail program of the TPharm and TRRx contracts, ESI adjudicates and approves prescription drug claims presented by TRICARE beneficiaries to retail pharmacies (*e.g.*, Walgreens, CVS, and others).  ESI verifies whether the person presenting the prescription is an eligible TRICARE beneficiary, and, if so, ESI adjudicates the claim.  ESI adjudicates the claim by determining whether the product for which the prescription is written can be cost shared by TRICARE.  Knowing that non-drugs and unapproved drugs were ineligible for TRICARE cost sharing, ESI nonetheless adjudicated and approved hundreds of thousands of retail claims for such products.  Compliance with TRICARE regulations and contractual terms that prohibit TRICARE cost sharing non-drugs and unapproved drugs were material conditions of payment. ESI nonetheless submitted invoices to the Government for its adjudication services knowing it failed to comply with these material conditions of payment.  As it relates to these ineligible products, ESI caused hundreds of millions of dollars of financial harm to the United States in the following ways.  First, using Government funds to which the Government gave ESI access, ESI remitted payment to retail pharmacies for each prescription product dispensed (the "dispensing

---

[2] *See* 32 C.F.R. §199.4(g)(15) (excluding from TRICARE coverage any drug the safety and efficacy of which has not been established by the FDA); 32 C.F.R §199.4(d)(3)(vi)(B) (excluding from TRICARE coverage drugs unapproved by the FDA for commercial marketing); and TRICARE Policy Manual 6010.54-M, ch. 1, §2.1, ¶(I)(A), (stating "[a]ny drug . . . whose safety and efficacy has not been established is unproven and excluded from coverage.").

fee"). Second, again using Government funds, ESI reimbursed the retail pharmacy its product

cost minus any co-pay (the "product cost"). Third, under the cost-plus reimbursement clauses of

the contract, ESI submitted to the Government an invoice seeking payment for each product it

approved to be dispensed by its retail pharmacy partner (the "media fee" or "adjudication fee" or

"administrative fee"), despite the fact that the products were ineligible for cost-sharing under

TRICARE's regulations.

7.      Mail order:      Under the mail-order program of the TPharm and TMOP contracts, ESI

fills a TRICARE beneficiary's drug prescription by mail. As with the retail program, when

adjudicating these prescriptions, ESI verifies whether the person for whom the prescription is

written is an eligible TRICARE beneficiary, and, if so, ESI will then adjudicate the claim. ESI

adjudicates the claim by determining whether the product can be cost shared by TRICARE. If

ESI determines the product is eligible for TRICARE cost sharing, then it dispenses the product to

the TRICARE beneficiary by mail. Under the cost-plus reimbursement clauses of the contract,

ESI then submits an invoice to the Government seeking payment for each prescription product

dispensed by mail (the "dispensing fee"). As it relates ESI's invoices for its dispensing fees,

compliance with TRICARE regulations and contractual terms that prohibit TRICARE cost-

sharing of non-drugs and unapproved drugs were material conditions of payment. ESI

nonetheless submitted invoices to the Government for dispensing fees knowing it failed to

comply with material conditions of Government payment. ESI caused hundreds of millions of

dollars of financial harm to the United States in the following ways. First, ESI caused the

Government to cost share products ineligible for TRICARE cost sharing (the "product cost").

Second, under the cost-plus reimbursement clauses of the contract, ESI submitted to the

Government an invoice seeking payment for each product it dispensed by mail (the "dispensing

fee"), knowing it failed to comply with material conditions of payment, which include, *inter alia*, prohibitions on TRICARE cost sharing non-drugs and unapproved drugs.

8.      In addition, ESI caused financial harm to the Government when it submitted invoices and received Government payment for contract performance under the TPharm, TMOP, and TRRx contracts knowing it failed to perform material contractual obligations and knowing it failed to comply with material conditions of payments.  Some of ESI's material failures, for which it requested and received Government payment, include: 1) ESI caused the Government to pay for products ineligible for TRICARE cost sharing; 2) ESI failed to recoup payments it made, using Government funds, to retail pharmacies for their dispensing fees for products ineligible for TRICARE cost sharing; 3) ESI failed to recoup payments it made, using Government funds, to retail pharmacies for products that were ineligible for TRICARE cost sharing; 4) ESI failed to protect patient health by approving the dispensing of unapproved drugs; 5) ESI failed to fulfill its guarantees to the Government related to the guaranteed average price adjustment; 6) ESI failed to switch patients from branded drugs to generics; 7) ESI failed to perform medical necessity reviews for prescriptions when required; 8) ESI failed to determine whether drugs prescribed for off-label use met TRICARE cost sharing criteria; and 9) although the contracts require ESI to detect, stop, and remedy fraud, ESI actually committed fraud by exploiting the cost-reimbursement clauses of the contracts when it a) caused the Government to pay for products ineligible for TRICARE cost sharing and b) then submitted invoices for fees for adjudicating (retail and mail) and dispensing (mail) products.  These obligations were material conditions of Government payment.  ESI nonetheless submitted invoices seeking Government payment for contract performance knowing it failed to comply with material conditions of payment, which include, *inter alia*, prohibitions on TRICARE cost sharing non-drugs and unapproved drugs.

4

9.      ESI's actions also amount to reverse false claims in violation of the FALSE CLAIMS ACT,

31 U.S.C. §3729(a)(1)(G).  ESI has failed to return the millions of dollars it improperly received

from the Government for its contract performance, which were so substandard to be worthless.

Additionally, ESI has failed to return the millions of dollars it received from the Government for

adjudicating and dispensing products ineligible for TRICARE cost sharing.  ESI knows it is not

entitled to keep these overpayments yet has kept them for more than 60 days.  ESI's failure to

return these overpayments amount to obligations owed to the Government and are false claims

under 31 U.S.C. §3729(a)(1)(G).

10.     Underlying this case is that ESI fraudulently induced TRICARE to award it the TPharm

contract.  When submitting its bid in response to the TPharm contract solicitation, ESI promised

TRICARE it would perform all material contractual obligations knowing that, upon being

awarded the contract, it would not.  In fact, ESI has failed to perform material obligations called

for under the TPharm contract yet has requested and received Government payment for contract

performance.

11.     This case not only involves financial harm to the Government, it also impacts service

members' and their dependents' health.  Thousands of drugs, unapproved by the FDA, are in the

marketplace, many of which are known to cause patient harm and, in some cases, death.[3]

Through a variety of enforcement actions over the past five decades, the FDA has sought to

crack down on this illegal trade by removing these unapproved drugs from the market.  ESI

knows unapproved drugs cannot be distributed yet persists in dispensing these products.  ESI's

---

[3]  *See, e.g.*, FDA, *Drugs for Human Use; Unapproved and Misbranded Oral Drugs Labeled for Prescription Use and Offered for Relief of Symptoms of Cold, Cough, or Allergy, Enforcement Action Dates*, FDA-2011-N-0100, Fed. Reg. Vol. 76, No. 42 (Mar. 3, 2011) (stating, *inter alia*, "FDA has specific concerns about the products covered by this notice that are marketed as extended-release products.").  ESI has dispensed drugs that are the subject of this FDA Enforcement Action.

actions expose patients' to health risks and thwart the FDA's efforts to rid the market of unapproved drugs.

12.     The action is brought under the FALSE CLAIMS ACT, 31 U.S.C. 3729 *et seq.*

13.     As set out below, ESI's actions violated the FALSE CLAIMS ACT.  ESI's violations are ongoing.

## II.     JURISDICTION AND VENUE

14.     This *qui tam* action is brought under the FALSE CLAIMS ACT, 31 U.S.C. §§3729-3733.

15.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §1345 and 31 U.S.C. §3732(a).

16.     Under 28 U.S.C. §1391(b) and 31 U.S.C. §3732(a), venue is proper in the District of Colorado as this is the place where ESI's false claims arose, were made, or presented.  ESI transacts business in the District of Colorado.  TRICARE Management Activity (Acquisition Management Support), upon whom ESI presented false claims, is headquartered in Aurora, Colorado.

## III.     PROCEDURE

17.     This Complaint has been filed under seal as required by 31 U.S.C. §3730(b)(2).

18.     In accordance with 31 U.S.C. §3730(b)(2), Relators served this complaint and substantially all material evidence and information in their possession upon the Attorney General of the United States and the United States Attorney for the District of Colorado.

## IV.     PARTIES

19.     **The United States of America** created[4] the TRICARE Management Activity (TRICARE),[5] which is the health care program administered by the Department of Defense that

---

[4]  10 U.S.C. §§1079, 1086.
[5]  32 C.F.R. Part 199; *see also* DEPT. OF DEFENSE DIRECTIVE 5136.12 (May 31, 2001).

serves active duty military service members, National Guard and Reserve members, retirees, their dependents, survivors and certain former spouses worldwide.  As a major component of the Military Health System, TRICARE brings together the health care resources of the uniformed services and supplements them with networks of civilian health care professionals, institutions, pharmacies, and suppliers to provide access to health care services while maintaining the capability to support military operations.  TRICARE serves approximately 9.7 million beneficiaries worldwide.  In fiscal year 2012, the cost of TRICARE and the military health care system is over $54 billion, almost one-tenth of the Department of Defense's budget.[6]  TRICARE contracted ESI to administer TRICARE's pharmacy benefits program.

20.     Service upon the United States is to be made upon The Honorable Eric Holder, Attorney General, U.S. Department of Justice, 950 Pennsylvania Ave., NW, Washington, DC 20530-0001 and Mr. John Walsh, United States Attorney, United States Attorney's Office for the District of Colorado, 1225 17th Street, Suite 700, Denver, Colorado  80202.

21.     **Relator David Flowers** is a resident of the State of Texas.  He is registered and licensed to practice pharmacy by the State of Arizona.

22.     **Relator Joseph Lawrence** is a resident of the State of Texas.  He is registered and licensed to practice pharmacy by the states of Oklahoma and Texas.

23.     Relators bring this action based upon their independent and direct knowledge.

24.     **Defendant Express Scripts, Inc.** (ESI) is a Delaware Corporation doing business throughout the United States and headquartered in St. Louis, Missouri.  Its registered agent is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington County, New Castle, Delaware 19808.

---

[6] *See* TRICARE, *Evaluation of the TRICARE Program: Access, Cost, and Quality, Fiscal Year 2012 Report to Congress* at 17 – 18 (Feb. 28, 2012) available at <http://www.tricare.mil/hpae/_docs/2012eval/index.html> (last viewed Sep. 2, 2012).

25.     In the event any parties are misnamed or not included herein, such was a "misnomer" or such parties are "alter egos" of named parties.  In the event that the true parties are misidentified, Relators rely upon the doctrine of misidentification.

26.     At all relevant times, ESI acted through its agents and employees, and their acts were within the scope of their agency and employment.  The policies and practices alleged in this Complaint were conducted by ESI on a regular, repeated, and continuous basis, as a regular course of doing business over a substantial period of years and are ongoing.

## V.     TRICARE CONTRACTED ESI TO ADMINISTER ITS PHARMACY BENEFITS PROGRAM

### A.     The Government Contracted ESI to Administer the TRICARE Retail and Mail Order Pharmacy Benefits Program

#### 1.     The TPharm Contract (Awarded in 2008)

27.     Pursuant to 10 U.S.C. §1074g, the Department of Defense created a Pharmacy Benefits Program for the Military Health System.  *See* 32 C.F.R. §199.21 (describing the program).  On January 22, 2008, TRICARE published[7] a solicitation inviting bids for the TRICARE Pharmacy Program Services Contract (TPharm).  The solicitation synopsis describes the services requested as follows:

> The Department of Defense, TRICARE Management Activity intends to issue a solicitation on or about February 6, 2008 for the provision of pharmacy benefits services to eligible TRICARE beneficiaries through retail pharmacies and a mail order pharmacy(ies).  The DoD currently offers worldwide pharmacy services dispensed to eligible TRICARE beneficiaries through three (3) venues: (1) direct care pharmacies located at Military Treatment Facilities (MTFs), (2) retail network pharmacy services (TRRx), and (3) the TRICARE Mail Order Pharmacy (TMOP).  Claims processing for prescriptions dispensed at non-network

---

[7] *See* TRICARE Solicitation Number H94002-07-R-0004, available at <https://www.fbo.gov/?s=opportunity&mode=form&tab=core&id=e6f95783ee12ee2106ba71369ff5530c&_cview=0> (last visited Sep. 2, 2012).

retail   pharmacies   are   currently   processed   under   TRRx.

The anticipated solicitation will be for a TRICARE Pharmacy Program Services (TPharm) contract that will consolidate the TRICARE retail network pharmacy, the mail order pharmacy(ies), and claims processing for prescriptions dispensed at non-network retail pharmacies, together with required beneficiary support services, into a single set of services to be operated by a contracted pharmacy benefits manager (PBM).  The period of performance is anticipated to be six (6) years, six (6) months from the date of award, comprised of: 1) a base period that will facilitate the phase-in for delivery of the mail order pharmacy requirements first, followed by the retail network pharmacy requirements transition three months later, and 2) option periods for delivery of services. All interested sources capable of performing these services will be considered.  The proposed contract type is hybrid, with primarily fixed price per unit Indefinite Quantity/Requirements type contract line items for prescription claims and clinical services. [8]

28.     ESI submitted a bid, as did three competitors.  Based upon information and belief, ESI certified to TRICARE it was a responsible contractor, was capable of performing, would deliver all services set forth in the solicitation and statement of work, presented true and accurate pricing and costs information, and would comply with all law and regulation applicable to the operation of the TPharm contract.  After a competitive evaluation process involving other bidders, TRICARE awarded the TPharm contract to ESI on June 27, 2008.  A redacted copy of the TPharm contract is located at Appendix A.  Upon its acceptance of the contract, ESI certified the following:

Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein.  The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein.

TPHARM CONTRACT AT item 17 ("Contract's Negotiated Agreement").

---

[8]  *Id.*

29.     The Government allocated $2,776,008,187.70 for TPharm.  TPharm is a six-year contract that ends on November 20, 2014.  TPharm is hybrid firm-fixed price and cost-reimbursable contract:

> This is a hybrid contract, with primarily fixed price per unit contract line items (CLINs) awarded as Indefinite Delivery/Requirements type contract items pursuant to FAR 16.503, Firm-Fixed-Priced CLINs awarded as Firm-Fixed-Price contract items pursuant to FAR 16.202, and *cost-reimbursable CLINs* awarded as cost type contract items pursuant to FAR 16.302.  The contract also contains provisions for Award Fee, Performance Guarantees, and Retail Network Pharmaceutical Cost Guarantees/Incentives.

TPHARM CONTRACT at §H.6 ("CONTRACT TYPE") (emphasis added).

30.     Under TPharm, TRICARE pays ESI to administer TRICARE's retail and mail order pharmacy programs and act as TRICARE's fiscal intermediary when adjudicating prescription drug claims.  Specifically:

> Under this TRICARE Pharmacy (TPharm) contract . . . the contractor will function as a Pharmacy Benefits Manager (PBM) to provide the Mail Order Pharmacy (MOP) (including specialty pharmacy) services, provide a TRICARE retail pharmacy network, and perform as a fiscal intermediary on behalf of DoD to pay for all *authorized pharmaceuticals* and supplies dispensed for eligible beneficiaries at retail pharmacies.

TPHARM CONTRACT at §C.1 (Program Description) (emphasis added).  Section C.1.1 of TPharm states:

> Government funds . . . will be used by [ESI] to pay for all TRICARE prescriptions[9] dispensed by network and non-network retail pharmacies.  [ESI] will be paid fees at the contracted rate for performing administrative services under the contract, such as functioning as a *fiscal intermediary* for the Government.  . . .

---

[9]  The term "prescription means an order for medication which is dispensed to or for an ultimate user but does not include an order for medication which is dispensed for immediate administration to the ultimate user (e.g., an order to dispense a drug to a bed patient for immediate administration in a hospital is not a prescription)."  21 C.F.R. §1300.01(b)(35).  All items dispensed by ESI under TPharm involve drugs or non-drugs dispensed under health care provider's prescription to the ultimate user, that is, the patient or patient's representative (spouse or parent).

> [ESI] will issue payment using Government funds to pay each TRICARE prescription dispensed at retail network pharmacies after receiving the Government's verification of the individual beneficiary's eligibility and authorization for payment. Therefore, the Government will be acquiring *covered drugs* and procuring them for the use of the Federal Government in support of this contract with Government funds.

TPHARM Contract at §C.1.1 (emphasis added).

31.     It IS important to keep in mind the following facts about TPharm: 1) TRICARE hired ESI to act as its fiscal intermediary for its pharmacy benefits program; 2) the Government gives ESI access to Government bank accounts to adjudicate retail pharmacy claims; 3) using Government funds, ESI remits payment to retail pharmacies on behalf of the Government; 4) by law, TRICARE cannot cost share most non-drugs (*e.g.*, medical foods or supplements), over-the-counter drugs, and drugs unapproved by the FDA; 5) as it relates to adjudicating prescription claims, ESI may bill the Government only if it approves a prescription claim—it earns no fee if it rejects a claim; and 6) the products in question are ineligible for TRICARE cost sharing and involve mostly non-drugs (*e.g.*, medical foods and supplements), over-the-counter drugs, and unapproved drugs.

### 2.     The Retail Program Under the TPharm Contract

32.     Under the Retail program of TPharm, TRICARE contracted ESI to adjudicate prescription drugs claims presented by TRICARE beneficiaries to retail pharmacies, such as Walgreens, CVS, and others.  ESI established a retail pharmacy network.  ESI does not actually dispense products under the Retail program, but rather, acting as TRICARE's fiscal intermediary, adjudicates prescription drug claims at the point of sale.  *See* TPHARM CONTRACT at §C.5.2.4.1 (stating "[t]he contractor shall accept and process all claims for pharmaceutical agents . . . *covered under the TRICARE pharmacy benefit*, and purchased from a licensed

pharmacy . . . .  Claims for pharmaceutical agents . . . ordered by and administered by an authorized provider or clinic *shall be provided in accordance with TPM, Chapter 8, Section 9.1.*") (emphasis added).  When a TRICARE beneficiary presents a prescription to a retail pharmacy, ESI first verifies whether the person is a TRICARE beneficiary.  The Department of Defense provides ESI access to a database to verify the person's TRICARE eligibility.[10]  If eligible, ESI will adjudicate the claim.  This involves ESI using its own adjudication platform to determine whether TRICARE is authorized to cost share the product in question.  If ESI determines the product in ineligible for TRICARE cost sharing, then it rejects the claim.  If ESI determines the product is eligible for TRICARE cost sharing, then it approves the claim and authorizes its retail pharmacy partner to dispense the product.  ESI then uses Government funds to pay its retail pharmacy partner a dispensing fee and reimburse the pharmacy for its product cost.  The TPharm contract states:

> The Government will bear the cost of retail prescriptions dispensed under this contract.  The contractor acts as a Fiscal Intermediary for the Government to distribute, or pass-through, Government funds for certain pharmacy benefits. . . .  The contractor shall establish and use a minimum of two separate bank accounts to reimburse claims in accordance with this section. One bank account will be used for transactions related to beneficiaries who are covered by TRICARE, but not Medicare (TRICARE-only Eligible).  The second bank account will be used for transactions related to dual eligible beneficiaries who are eligible for coverage under both Medicare and TRICARE (Medicare-Dual Eligible).

TPHARM CONTRACT at §§G.5.7.1, G.5.7.2.  ESI accesses United States bank accounts to remit Government payment to the retail pharmacy.  *See* TPHARM CONTRACT at §G.7.1.1 (stating "[t]he Government will bear the cost of retail prescriptions dispensed under this contract.  On behalf of

---

[10]  *See* TPHARM CONTRACT at §C.5.1, which, pursuant to this clause, the Government requires ESI to interface with the Defense Enrollment Eligibility Reporting System (DEERS) to verify a person's eligibility for TRICARE benefits; *see also* §C.5.1.1 (stating "Eligibility Verification.  The contractor shall verify eligibility prior to providing any of the services requires under this contract.").

the Government, ESI remits payments to retail pharmacies by drawing funds from a designated

United States Federal Reserve Bank.  *See* TPHARM CONTRACT at §G.7.1.5 (stating [p]harmacy

benefit payments by [ESI] on behalf of the Government will be facilitated by allowing [ESI]

(through [ESI's] financial institution) to draw money from the designated Federal Reserve

Bank.").   The contractor [ESI] acts as a Fiscal Intermediary for the Government to distribute, or

pass-through, Government funds for certain pharmacy benefits.").  The TPharm contract states:

> Government funds . . . will be used by the contracted PBM to pay
> for all TRICARE prescriptions dispensed by network and non-
> network retail pharmacies.   The PBM will be paid fees at the
> contracted rate for performing administrative services under the
> contract, such as functioning as a *fiscal intermediary* for the
> Government. . . .   The PBM will issue payment using Government
> funds to pay each TRICARE prescription dispensed at retail
> network pharmacies after receiving the Government's verification
> of the individual beneficiary's eligibility and authorization for
> payment.   Therefore, the Government will be acquiring *covered
> drugs* and procuring them for the use of the Federal Government in
> support of this contract with Government funds."

TPHARM CONTRACT at §C.1.1 (emphasis added).  As set out below, however, the products that

are the subject of this case were ineligible for TRICARE cost sharing.  TRICARE authorized ESI

to use Government funds to pay retail pharmacies for covered prescription drugs only.  By law,

no TRICARE official can authorize ESI to use Government funds to pay retail pharmacies for

products ineligible for TRICARE cost sharing, such as medical foods, over-the-counter drugs,

and unapproved drugs.  By law, such products are excluded benefits of the TRICARE program.

While the patient could perhaps buy these products using his own money, the Government is not

authorized to pay for such products because they are not covered benefits under the TRICARE

program.

33.     For its adjudication services, under the cost-plus reimbursement terms of the TPharm

contract, ESI submits an invoice to the Government seeking a fee for each prescription product

*dispensed* by a retail pharmacy.  (These fees are interchangeably called "administrative fees" or "adjudication fees" or "media fees."  And each prescription could have multiple products.)  The applicable contract line numbers (CLIN) are X004 and X005.  The TPHARM contract at §G.8 discusses submitting invoices for these CLINs.  ESI invoices the Government for these fees by submitting a TRICARE Encounter Data Record (TED).  "Submission of a TED to [TRICARE] is considered submittal of an invoice."  TPHARM CONTRACT at §G.8.1.1.  ESI, however, failed to fulfill material conditions of payment when it submitted invoices seeking Government payment.  ESI sought and received payment for adjudicating retail prescription drug claims knowing it was not entitled to payment because it approved claims for products that were ineligible for TRICARE cost sharing.  ESI had a financial incentive to approve claims, which would allow the retail pharmacy to dispense the drug, rather than reject them because ESI earns a fee only if a product is dispensed.  *See* CLIN X005 (stating "this overarching CLIN is for administrative fees associated with *prescriptions dispensed* at retail . . . .").  ESI is not entitled to an adjudication fee if it rejects a claim.  In contrast, under CLIN X006, TRICARE would pay ESI a fee "*processing* electronic point of sale Department of Veterans Affairs beneficiary claims, including adjudication, through a retail pharmacy."  (None of the claims in this case involve VA claims.)  But again, ESI receives a fee only if a product is dispensed.  ESI knowingly failed to fulfill material conditions of payment when it submitted invoices seeking retail adjudication fees.  Those material conditions of payment included complying with the legal prohibitions on TRICARE cost sharing excluded products.  Rather than deny claims for ineligible products, ESI approved them because it could then bill the Government.

### 3.      The Mail Order Pharmacy Program Under the TPharm Contract

34.      Under the Mail Order Pharmacy (MOP) program of the TPharm contract, TRICARE

beneficiaries may submit their prescriptions directly to ESI rather than having them filed at a

retail pharmacy.  In this role, ESI actually is the pharmacist and dispenses prescription drugs, but

by mail.  The TPharm contract requires ESI to determine the validity of the prescription and

whether the product prescribed can be dispensed and cost shared by the Government.  *See*

TPHARM CONTRACT at §§C.5.3.1 (ESI required to verify telephone prescriptions), C.5.3.1.1 (ESI

required to contact prescriber about switching from a brand name product to a generic

equivalent), C.5.3.1.2 (requiring ESI to communicate with a beneficiary's whose prescription

requires clarification, intervention, or denial).  If ESI determines that the prescription product is a

covered benefit and thus can be dispensed, then ESI mails the product directly to the beneficiary.

*Id.* at §C.5.3.2.  As with retail, under the mail order program, ESI submits an invoice to the

Government using a TED voucher seeking reimbursement for dispensing and mailing each

prescription product.  Mail order dispensing fees are listed in contract line number X001, with

sub-CLINs X001AA, X001AB, X001AC, and X001AD.  "Submission of a TED to [TRICARE]

is considered submittal of an invoice."  *See* TPHARM CONTRACT at §G.8.1.1.  ESI bills the

Government a fee for each per product dispensed and mailed (a prescription could have multiple

products).  *See* TPHARM CONTRACT at §§G.5.3.6, G.10.1.  ESI is not entitled to a dispensing fee

if it rejects a claim.   Thus, ESI has a financial incentive to approve rather than reject mail order

claims because it can invoice the Government for those services under the cost-plus

reimbursement terms of the TPharm contract.

### 4.      The TRRx and TMOP Contracts

35.      Prior to the consolidation of the mail order and retail pharmacy benefits programs into the

TPharm contract, TRICARE used two contracts to administer its pharmacy benefits program.

a.   The TRRx Contract:   TRICARE awarded ESI the Retail Pharmacy Services Contract (TRRx) in September 2003.  As it relates to the retail program, the material terms of the TRRx  and TPharm (retail) contracts are essentially the same.  Most importantly, as with TPharm, under TRRx, acting as TRICARE's fiscal intermediary, ESI was not permitted to cause the Government to cost share unapproved drugs and most non-drugs.

b.   The TMOP Contract:   TRICARE awarded ESI the TRICARE Mail Order Pharmacy services contract (TMOP) on September 10, 2002.  As it relates to the mail order program, the material terms of the TMOP and TPharm (mail) contracts are essentially the same.

36.   The products dispensed:        ESI was approving to be dispensed products that were ineligible for TRICARE cost sharing.  Most of these products involved are over-the-counter products, medical foods, and supplements.  While the substantial majority of the products that are the subject of this case involve over-the-counter products and non-drugs (*e.g.*, medical foods), a significant percentage of them involve drugs unapproved by the FDA.  While the false claims associated with unapproved drugs are relatively small compared with claims related to over-the-counter products, the fact that ESI was knowingly dispensing drugs unapproved by the FDA is alarming and requires highlighting because ESI's actions thwart the FDA's mission and place patients at risk.  Part VI below discusses the legal restrictions on cost sharing over-the-counter products and non-drugs.   Parts VII and VIII below discuss the legal restrictions on cost sharing unapproved drugs.

## VI.  THE LAW PROHIBITS TRICARE COST SHARING OVER-THE-COUNTER PRODUCTS AND NON-DRUGS

### A. The Law

37.   TRICARE cannot cost share over-the-counter drugs and products (with the exception of insulin), and most non-drugs such as medical foods, and supplements.  Under the retail program (TPharm and TRRx), ESI knowing authorized and approved its retail pharmacy partners to dispense these products, then used Government funds to reimburse its retail pharmacies for their product cost and pay to its retail pharmacy partners their dispensing fees.  ESI then submitted an invoice to the Government seeking payment for each product dispensed by its retail pharmacy partners.  ESI knew these products were ineligible for TRICARE cost sharing.  Under the mail order program (TPharm and TMOP), ESI dispensed products knowing they were ineligible for TRICARE cost sharing.  ESI then submitted an invoice to the Government seeking payment for having dispensed these products.

38.   Restrictions on cost sharing over-the-counter products:  With a very few minor exceptions, TRICARE cannot cost share over the counter products.  *See* 32 C.F.R §199.4(d)(3)(vi)(A); TRICARE Policy Manual 6010.54-M, ch. 8, §9.1, ¶(II)(A).  Moreover, 32 C.F.R. §199.4(a)(1)(i) restricts TRICARE benefits to "prescription drugs" only.  Because over-the-counter products do not require a prescription, they are ineligible for TRICARE cost sharing, even if a prescription is written for them.[11]

---

[11] 32 C.F.R. §199.4(a)(1)(i) states:

> Scope of benefits.  Subject to all applicable definitions, conditions, limitations, or exclusions specified in this part, the CHAMPUS Basic Program will pay for medically necessary services and supplies required in the diagnosis and treatment of illness or injury, including maternity care and well-baby care. Benefits *include . . . prescription drugs . . . .*

39.    <u>Restrictions on cost sharing medical foods</u>:   TRICARE cannot cost share medical foods, food substitutes, vitamins, and other nutritional supplements, including those related to prenatal care.   *See* 32 C.F.R §199.4(g)(57) (excluding from TRICARE coverage: "Food, food substitutes. Food, food substitutes, vitamins, or other nutritional supplements, including those related to prenatal care.");[12] TRICARE Policy Manual 6010.54-M, ch. 1, §1.1, ¶(I)(57).

40.    <u>Restrictions on cost sharing weight management products</u>:   TRICARE cannot cost share agents used to suppress appetite, control fat absorption, or manage weight.   *See* 32 C.F.R §199.4(g)(28) (excluding from TRICARE coverage: "Obesity, weight reduction. Service and supplies related 'solely' to obesity or weight reduction or weight control whether surgical or nonsurgical"); TRICARE Policy Manual 6010.54-M, ch. 1, §1.1, ¶(I)(A).

41.    <u>Restrictions on cost sharing weight products for cosmetic only indications</u>:   TRICARE cannot cost share agents used to for cosmetic only indications, such as chemical peels or hair growth drugs.   32 C.F.R §199.4(g)(24) (excluding from TRICARE coverage: "Services and supplies in connection with cosmetic, reconstructive, or plastic surgery except as specifically provided in paragraph (e)(8) of this section."), (41) (hair growth products); TRICARE Policy Manual 6010.54-M, ch. 1, §2.1 (chemical peeling).

42.    <u>Restrictions on cost sharing injectables (other than insulin products)</u>:   TRICARE cannot cost share injectables, other than insulin products.   *See* 32 C.F.R §199.4(d)(3)(vi)(A);[13] TRICARE Policy Manual 6010.54-M, ch. 8, §9.1, ¶(I)(D).

---

12  Note, subsection (g) of section 199.4 of 32 C.F.R. lists a series of products specifically excluded.  Subsection (g) states "Exclusions and limitations.  In addition to any definitions, requirements, conditions, or limitations enumerated and described in other sections of this part, the following specifically are excluded from the Basic Program[.]"

[13]  32 C.F.R §199.4(d)(3)(vi)(A) states:

> Drugs administered by a physician or other authorized individual professional provider as an integral part of a procedure covered under paragraph (b) or (c) of this section (such as chemotherapy) are not covered under this subparagraph

43.   <u>Restrictions on cost sharing vitamins</u>:  With a very few minor exceptions, TRICARE cannot cost share vitamins.  *See* 32 C.F.R §199.4(g)(57); TRICARE Policy Manual 6010.54-M, ch. 8, §9.1 (excluding from TRICARE coverage: "Food, food substitutes. Food, food substitutes, vitamins, or other nutritional supplements, including those related to prenatal care."); TRICARE Policy Manual 6010.54-M, ch. 8, §§7.1, 7.2 (food substitutes, vitamins, or nutritional supplements, including those related to prenatal care).

44.   <u>Restrictions on smoking cessation products</u>: TRICARE cannot cost share smoking cessation products.  *See* 32 C.F.R §199.4(g)(65) (excluding from TRICARE coverage: "'Stop smoking' programs.  Services and supplies related to 'stop smoking' regimens."); TRICARE Policy Manual 6010.54-M, ch. 1, §1.1, ¶(I)(A)(64).

45.   <u>Restrictions on cost sharing homeopathic drugs</u>:   TRICARE cannot cost share homeopathic drugs.  *See* 32 C.F.R §199.4(e)(15) (unproven drugs cannot be cost shared); 32 C.F.R §199.4(e)(15)(i)(A) (TRICARE cannot cost share when "[a] drug . . . is unproven: if the drug . . . cannot be lawfully marketed without the approval or clearance of the United States Food and Drug Administration (FDA) and approval or clearance for marketing has not been given at the time the drug . . . is furnished to the patient.");  (TRICARE Policy Manual 6010.54-M, ch. 8, §9.1, ¶(II)(C)(1a) ("Drugs may be cost shared when: The drugs is approved for marketing by the U.S. Food and Drug Administration"); TRICARE Policy Manual 6010.54-M, ch. 8, §§7.1, 7.2 (food substitutes, vitamins, or nutritional supplements, including those related to prenatal care); and (TRICARE Policy Manual 6010.54-M, ch. 1, §2.1, ¶(I)(A) ("Any drug . . . whose safety and efficacy has not been established is unproven and excluded from coverage.").

---

inasmuch as the benefit for the institutional services or the professional services
in connection with the procedure itself also includes the drug used.

46.     These cost-sharing rules, among others too numerous to list here, were material to the Government's decision to pay ESI for its claims submitted to the Government.  The TPharm contract explicitly incorporates TRICARE regulations that prohibit TRICARE cost sharing these products.  Specifically, §C.4.2 of the TPharm Contract incorporates 32 C.F.R. 199 and TRICARE manuals, as shown above, all of which explicitly exclude from coverage the products listed above and the products listed in the spreadsheets in the Appendices.   Paragraph C.4.2 of the TPharm Contract states "[t]hese documents form an integral part of this contract and have the same force and effect as if set forth in full text."

**B.     Products Other Than FDA-Unapproved Drugs that ESI Caused TRICARE to Cost Share**

47.     Attached at the Appendix B is spreadsheet that lists the products that ESI dispensed (mail) and approved to be dispensed by its retail pharmacy partners (retail), which were ineligible for TRICARE cost sharing.  For ease, these products are at times referred to as "non-drugs."  These spreadsheets are:

48.     ESI dispensed the non-drug products listed in the spreadsheets identified above.  Even though ESI knew these products are ineligible for TRICARE cost sharing, ESI approved them to be dispensed, and used Government funds pay for these products for a total sum of approximately $1,383,645,004.  The Government paid ESI millions of dollars in dispensing fees related to these products.

49.     Under retail and mail, ESI approved to be dispensed over 20,832,578 prescriptions for products ineligible for TRICARE cost sharing, causing TRICARE to pay a total of $1,383,645,004 in product cost.  In addition, ESI used Government funds to remit payment to its retail pharmacies for their dispensing fees, the cost of which will have to be determined through discovery.  In addition, ESI submitted invoices to the Government for its services adjudicating

these approved claims (both under mail and retail), the cost of which will have to be determined

through discovery.  Based upon information and belief, these false claims are ongoing and the

Government continues to be harmed.  This chart summarizes these false claims.

| NON-PHARMACEUTICAL AGENTS DISPENSED BY ESI INELIGIBLE FOR TRICARE COST SHARING | | |
|---|---|---|
| **Contract** | **# of prescriptions** | **Product Cost ESI Caused the Government to Incur** |
| **TMOP** | 1,805,400 | $239,379,805 |
| **TPharm - Retail** | 4,201,801 | $256,966,473 |
| **TPharm – Mail** | 856,894 | $79,768,148 |
| **TRRX** | 13,968,483 | $807,530,578 |
| **Grand Total** | **20,832,578** | **$1,383,645,004** |

50.     Under retail and mail, ESI approved to be dispensed over 510,737 prescriptions for over-

the-counter products, causing the TRICARE to pay a cost of $3,607,502 in product cost.  Of

these 510,737 prescriptions, 509,438 were dispensed at retail.  For these retail claims, ESI used

Government funds to remit payment to its retail pharmacies for their dispensing fees, the cost of

which will have to be determined through discovery.  In addition, ESI submitted invoices to the

Government for its services adjudicating these claims (both under mail and retail), the cost of

which will have to be determined through discovery.  Based upon information and belief, these

claims are ongoing and the Government continues to be harmed.  This chart summarizes these

false claims.

| OVER-THE-COUNTER DRUGS DISPENSED BY ESI INELIGIBLE FOR TRICARE COST SHARING | | |
|---|---|---|
| **Contract** | **# of prescriptions** | **Product Cost ESI Caused the Government to Incur** |
| TMOP | 645 | $15,872 |
| TPharm - Retail | 88,655 | $1,966,957 |
| TPharm – Mail | 744 | $76,121 |
| TRRX | 420,693 | $1,548,553 |
| **Grand Total** | **510,737** | **$3,607,502** |

## VII.   THE REGULATION OF DRUGS AND THE KNOWN PROBLEM OF FDA-UNAPPROVED DRUGS

51.     To eligible for payment, TRICARE regulations require prescription drugs be approved by the FDA to be both *safe* and *effective*.  TRICARE regulations explicitly exclude from coverage drugs the *safety* and *efficacy* of which have not been established by the FDA.  ESI disregarded these regulations and dispensed drugs that have not been approved by the FDA to be both safe and effective.

52.     32 C.F.R. §199.4(g)(15) states:

> (g)  *Exclusions and limitations.*  In addition to any definitions, requirements, conditions, or limitations enumerated and described in other sections of this part, the following specifically are excluded from the Basic Program:

> (15)  *Unproven drugs, devices, and medical treatments or procedures.*  By law, CHAMPUS can only cost-share medically necessary supplies and services.  Any drug . . . the safety and efficacy of which [has] not been established, as described in this paragraph (g)(15), is unproved and cannot be cost-shared by CHAMPUS except as authorized under paragraph 199.4(e)(26) [experimental cancer drugs used in NIH sponsored clinical trials] of this part.

22

(i)   A drug, device, or medical treatment or procedure is unproven:

(A)  If the drug or device cannot be lawfully marketed without the approval or clearance of the United States Food and Drug Administration (FDA) and approval or clearance for marketing has not been given at the time the drug or device is furnished to the patient.

In addition, 32 C.F.R §199.4(d)(3)(vi)(B) states:

[TRICARE] benefits may not be extended for drugs not approved by the U.S. Food and Drug Administration for commercial marketing.  Drugs grandfathered[14] by the Federal Food, Drug and Cosmetic Act of 1938 may be covered under CHAMPUS as if FDA approved.

53.    Furthermore, TRICARE Policy Manual 6010.54-M, ch. 1, §2.1, ¶(I)(A), states "Any drug . . . whose safety and efficacy has not been established is unproven and excluded from coverage."  Finally, the 32 C.F.R. §199.4(d)(3)(vi)(B) states "[TRICARE] benefits may not be extended for drugs not approved by the U.S. Food and Drug Administration for commercial marketing."

54.    ESI knows unapproved drugs may not be marketed, distributed, or dispensed.  ESI is the industry's second largest pharmacy benefits manager.  ESI manages drug benefits programs for over 50 million Americans.  ESI is an active member in professional associations such as the Pharmacy Benefit Management Institute, LP.  ESI has the capabilities to prohibit these drugs from being dispensed.  And, significant to this case, TRICARE regulations and material terms of the TPharm, TMOP, and TRRx contracts prohibit TRICARE cost sharing unapproved drugs.  ESI knowingly disregarded the law and dispensed, or approved to be dispensed, millions of prescriptions drugs ineligible for TRICARE cost sharing.  Some history of the regulation of drugs is useful in understanding this case.

---

[14]  As shown below, the FDA concludes that almost no drugs are grandfathered.

## A.    The Known Problem

55.    Before a drug may be legally marketed in the United States, the FDA must approve it for

safety and effectiveness.  Section 505(b) of the FOOD DRUG AND COSMETIC ACT OF 1938

(FDCA) prohibits new drugs without FDA approval from being introduced into interstate

commerce.  "No person shall introduce or deliver for introduction into interstate commerce any

new drug, unless an approval of an application [to the FDA] is effective with respect to such

drug."  21 U.S.C. §355(a).  A drug manufacturer or distributor obtains FDA approval by

submitting a New Drug Application (NDA) or an Abbreviated New Drug Application (ANDA)

in accordance with the FDCA and FDA regulations.  21 U.S.C. §355(b)-(b)(1); 21 C.F.R.

§314.50.

56.    According to the FDA, drugs lacking this approval may pose a significant public health

concern because they may not meet FDA standards for safety, effectiveness, quality, and

labeling.  For example, the FDA has announced

> [t]he Agency has serious concerns that drugs marketed without
> required FDA approval may not meet modern standards for safety,
> effectiveness, quality, and labeling.  The FDA drug approval
> process provides a review of product-specific information that is
> critical to ensuring the safety and efficacy of a finished drug
> product.  For instance, the applicant must demonstrate that its
> manufacturing processes can reliably produce drug products of
> expected identity, strength, quality, and purity.  Furthermore,
> FDA's review of the applicant's labeling insures that health care
> professionals and patients have the information necessary to
> understand a drug product's risks and its safe and effective use.[15]

57.    As it relates to the magnitude of the unapproved drug problem and its efforts to combat

this crisis, the FDA has noted

---

[15] FDA, *FDA's Concerns About Unapproved Drugs*, available at
<http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/SelectedEnforcementActionsonUnapprovedDrugs/ucm118961.htm> (last visited Aug. 21, 2012).

FDA estimates that in the United States today perhaps as many as several thousand drug products are marketed illegally without required FDA approval.  (This rough estimate comprises several hundred drugs (different active ingredients) in various strengths, combinations, and dosage forms from multiple distributors and repackagers.)  Because we do not have complete data on illegally marketed products, and because the universe of such products is constantly changing as products enter and leave the market, we first have to identify illegally marketed products before we can contemplate enforcement action.  Once an illegally marketed product is identified, taking enforcement action against the product would typically involve one or more of the following: requesting voluntary compliance; providing notice of action in a *Federal Register* notice; issuing an untitled letter; issuing a Warning Letter; or initiating a seizure, injunction, or other proceeding. Each of these actions is time-consuming and resource intensive.[16]

## B.     Why So Many Unapproved Drugs are in the Market

58.     A number of factors have contributed to the thousands of unapproved drugs in the market.  The evolution of the regulation of drugs is one factor.  Many brazen companies simply disobey the law by manufacturing, marketing, and distributing these drugs.  The FDA's limited resources have been overwhelmed, and consequently the FDA has had to prioritize its enforcement efforts, zeroing in on those drugs that are known to cause patient harm, yet knowing that many other illegal drugs are marketed and distributed.  Industry leaders like ESI, knowing of the legal prohibitions of the marketing and distribution of unapproved drugs, nonetheless continue to distribute and dispense these illegal drugs, exacerbating this public health policy crisis, thwarting the FDA's remedial efforts, all the while causing the Government to waste hundreds of millions of dollars on these unapproved and non-drugs, which TRICARE cannot cost share.  As a pharmacy benefits manager, ESI has profited from this illegal trade.  The

---

[16]  S*ee* GUIDANCE FOR FDA STAFF AND INDUSTRY, *Marketed Unapproved Drugs Compliance Policy Guide*, Sec. 440.100 Marketed New Drugs Without Approved NDAS or ANDAs, U.S. Dept. of HHS, FDA, Center for Drug Evaluation and Research at 3 (Sep. 19, 2011).

evolution of the regulation of drugs is useful in appreciating the phenomenon of the FDA-

unapproved drug trade.

## C.    The Evolution of the Regulation of Drugs

### 1.    The Food, Drug, and Cosmetic Act of 1938

59.    In 1938, Congress passed the FDCA, which required manufacturers to submit to the FDA

a New Drug Application (NDA) demonstrating "safety" in order to obtain approval to market a

new drug.  *See* Pub. L. No. 75-717, 52 Stat. 1040 (1938).  The 1938 Act also created a category

called "new drugs" (*i.e.*, those which are not generally recognized as safe (GRAS) for use in the

conditions prescribed, recommended, or suggested in the labeling, and those that have not been

used to a material extent or time under such conditions.)  The 1938 Act created a category called

"grandfathered drugs." *See* 21 U.S.C. § 321(p)(1) (describing grandfathered drugs as drug

products on the market prior to 1938 and which contained in their labeling the same

representations concerning conditions of use as it did prior to 1938.).  Grandfathered drugs were

not considered new drugs, and were therefore exempt from the new drug application requirement

of the Act.  *Id.*  Between 1938 and 1962, many new drugs claiming to be similar to approved

drugs were marketed illegally or were launched with an advisory opinion from the FDA that they

were recognized as safe.  *See Weinberger v. Hynson, Westcott and Dunning,* 412 U.S. 609, 623-

24 (1973).

### 2.    The 1962 Amendments to the FDCA and the DESI Program

60.    In 1962, Congress amended the FDCA to require manufacturers to demonstrate that any

new drug was "effective," as well as "safe," in order to obtain FDA approval.  *See* 21 U.S.C.

§355(b)(1)(A); *see also United States v. Generix Drug Corp.*, 460 U.S. 453, 458 (1983).  Since

1962, in order to obtain approval of a new drug, a drug manufacturer or distributor must submit

an NDA or Abbreviated New Drug Application (ANDA) in accordance with the amended FDCA and subsequent regulations. *See* 21 U.S.C. §§ 355(b)-(b)(1), (j); 21 C.F.R. §§ 314.50, 314.94. The 1962 Amendments also required the FDA to conduct a retrospective evaluation of the effectiveness of drug products that the FDA had approved as safe between 1938 and 1962. This evaluation process became known as the Drug Efficacy Study Implementation (DESI) Program. If, after DESI review, the FDA determined that a drug or class of drugs was ineffective for its indications, it issued a Notice of Opportunity for a Hearing (a "NOOH" or DESI notice) in the Federal Register proposing to withdraw approval for the drug and all Identical, Related, or Similar drugs, even if the IRS drug was not specifically listed in the NOOH. *See* 21 C.F.R. § 310.6(a). These drugs came to be known as Less Than Effective DESI / Identical, Related, or Similar ("IRS") drugs (LTE DESI/IRS). Each NOOH gave any interested person the opportunity to challenge the ineffectiveness determination. If there was no challenge, the FDA generally withdrew approval for the drugs listed in the NOOH, as well as for all IRS drugs.

### 3. DESI Notices Apply to Drugs that are "Identical, Related, or Similar"

61. When the FDA developed the DESI Program, it realized it would be both inequitable and inconsistent with the purpose of the 1962 Amendments to require drugs that had "safety only" (*i.e.,* pre-1962) NDAs to prove their effectiveness, while exempting from that burden "identical, related, or similar" drugs that did not have NDAs. Thus, in 1972, FDA promulgated a regulation, currently set forth at 21 C.F.R. §310.6, under which DESI notices would apply to any unapproved drugs that were identical, related, or similar to a drug with an NDA named in a DESI notice:

> Many products which are identical to, related to, or similar to the
> products listed in these notices have been marketed under different
> names or by different firms during this same period [1938-1962] or
> since 1962 without going through the new drug procedures or the

> [DESI] review. Even though these products are not listed in the notices, they are covered by the new drug applications reviewed and thus are subject to these notices.

21 C.F.R. §310.6(a). The regulation explains that "[i]t is not feasible for the [FDA] to list all products which are covered by an NDA and thus subject to each notice. However, it is essential that the findings and conclusions that a drug product is a 'new drug' or that there is a lack of evidence to show that a drug product is safe or effective be applied to all identical, related, and similar products to which they are reasonably applicable." *Id.*

62. Paragraph (b)(1) of the regulation states "[a]n identical, related, or similar drug includes other brands, potencies, dosage forms, salts, and esters of the same drug moiety as well as any drug moiety related in chemical structure or known pharmacological properties." 21 C.F.R. §310.6(b)(1). When it promulgated the regulation, the FDA felt it was "necessary that the [IRS] definition be broad so that manufacturers are alerted to the possibility of their products being affected." 37 Fed. Reg. 23,185 (Oct. 31, 1972). Paragraph (c) of the regulation places the responsibility to review DESI notices and to ensure that their products are in compliance squarely on manufacturers and distributors such as ESI: "[m]anufacturers and distributors of drugs should review their products as drug efficacy notices are published and assure that identical, related, or similar products comply with all applicable provisions of the notices." 21 C.F.R. §310.6(c). If a distributor such as ESI is not certain whether the product its distributing is covered, paragraph (b)(3) of the regulation provides that "[a]ny person may request an opinion on the applicability of such a notice to a specific product by writing to the [FDA] at the address shown in paragraph (e) of this section." 21 C.F.R. §310.6(b)(3). Thus, the IRS regulation accomplishes three goals: 1) it makes "new drug" and DESI notices applicable to IRS products; 2) it places the responsibility upon distributors such as ESI and manufacturers to review "new

drug" and DESI notices to determine whether their products are subject to any of the notices; and

3) it explains to distributors such as ESI and manufacturers that, if there is any uncertainty as to

the applicability of a notice, they may obtain an opinion from the FDA.

### 4.    Almost No Drugs are Grandfathered

63.    Some in the industry contend that some drugs need no NDA because they are

"grandfathered."  That is, because some drugs were marketed before the enactment of the FDCA.

See 21 U.S.C. §321(e)(1).  The FDA, however, has concluded that virtually no drugs are

grandfathered.  *See* U.S. DEPT. OF HEALTH & HUMAN SERVICES, FDA, CENTER FOR DRUG

EVALUATION AND RESEARCH, *Guidance for FDA Staff and Industry, Marketed Unapproved*

*Drugs—Compliance Policy Guide, Sec. 440.100, Marketed New Drugs Without Approved NDAs*

*or ANDAs* (June 2006) (hereinafter "2006 CPG").  In its 2006 CPG, the FDA noted:

> Under the 1962 grandfather clause, the FDCA exempts a drug
> from the effectiveness requirements if its composition and labeling
> has not changed since 1962 and if, on the day before the 1962
> Amendments became effective, it was (a) used or sold
> commercially in the United States, (b) not a new drug as defined
> by the FD&C Act at that time, and (c) not covered by an effective
> application.  *See* Public Law 87-781, section 107 (reprinted
> following 21 U.S.C.A. 321); *see also USV Pharmaceutical Corp.*
> *v. Weinberger*, 412 U.S. 655, 662-66 (1973); Guidance for FDA
> Staff and Industry, Marketed Unapproved Drugs Compliance
> Policy Guide, Sec. 440.100 Marketed New Drugs Without
> Approved NDAS or ANDAs, U.S. Dept. of HHS, FDA, Center for
> Drug Evaluation and Research (Sep. 19, 2011).    The two
> grandfather clauses in the FDCA Act have been construed very
> narrowly by the courts.  FDA believes that there are very few
> drugs on the market that are actually entitled to grandfather status
> because the drugs currently on the market likely differ from the
> previous versions in some respect, such as formulation, dosage or
> strength, dosage form, route of administration, indications, or
> intended patient population.  If a firm claims that its product is
> grandfathered, it is that firm's burden to prove that assertion. *See*
> 21 CFR 314.200(e)(5); *see also United States v. An Article of Drug*
> *(Bentex Ulcerine)*, 469 F.2d 875, 878 (5th Cir. 1972); *United*

*States v. Articles of Drug Consisting of the Following: 5,906 Boxes*, 745 F.2d 105, 113 (1st Cir. 1984).[17]

**D.  The FDA's Enforcement Efforts to Remove Unapproved Drugs From the Market**

64.     Since 1976, the FDA has been aggressively combating the illegal manufacturing, marketing, and distribution of unapproved drugs.  Unapproved drugs are a public health problem.  Unapproved drugs may be unsafe, ineffective, of inferior quality, and there is no post-marketing surveillance as required with approved products.  From a variety enforcement efforts (*e.g.*, public notices in the federal register, FDA enforcement actions, FDA workshops, and so on), ESI, as the nation's second largest pharmacy benefits manager, knows of the legal prohibitions on marketing and distributing unapproved drugs.  Rather than following the law, ESI breaks the law when it distributes, or approves for distribution, unapproved drugs.  ESI's actions that are the basis of this case thwart the FDA's efforts to remove unapproved drugs from the market.  Using the TPharm, TRRx, TMOP contracts, ESI made millions of dollars by breaking the law.

**1.     FDA's Compliance Policy Guide**

65.     Beginning in 1976 through the present, the FDA has published a Compliance Policy Guide (CPG) setting forth the FDA's policies and enforcement priorities with respect to unapproved drugs.  Although the CPG has evolved and expanded over time, the FDA consistently has maintained certain positions:

> In general, in recent years, FDA has employed a risk-based enforcement approach with respect to marketed unapproved drugs. This approach includes efforts to identify illegally marketed drugs, prioritization of those drugs according to potential public health concerns or other impacts on the public health, and subsequent regulatory follow-up.  Some of the specific actions the Agency has

---

[17]     2006 CPG at 10 -11; *see also* 2011 CPG at 11 – 12 (same), available at <http://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm074382.htm> (last visited Sep. 4, 2012).

taken have been precipitated by evidence of safety or effectiveness problems that has either come to our attention during inspections or been brought to our attention by outside sources.

The enforcement priorities and potential exercise of enforcement discretion discussed in this guidance apply only to unapproved drug products that are being commercially used or sold as of September 19, 2011.  All unapproved drugs introduced onto the market after that date are subject to immediate enforcement action at any time, without prior notice and without regard to the enforcement priorities set forth below. In light of the notice provided by this guidance, we believe it is inappropriate to exercise enforcement discretion with respect to unapproved drugs that a company (including a manufacturer or distributor) begins marketing after September 19, 2011.

For unapproved drugs commercially used or sold as of September 19, 2011, FDA's enforcement priorities are described below.

## A.  Enforcement Priorities

Consistent with our risk-based approach to the regulation of pharmaceuticals, FDA intends to continue its current policy of giving higher priority to enforcement actions involving unapproved drug products in the following categories:

> *Drugs with potential safety risks . . . .*

> *Drugs that lack evidence of effectiveness . . . .*

> *Health fraud drugs . . . .*

> *Drugs that present direct challenges to the new drug approval and OTC drug monograph systems . . . .*

> *Unapproved new drugs that are also violative of the Act in other ways . . . .*

> *Drugs that are reformulated to evade an FDA enforcement action . . . .*

*See* U.S. DEPT. OF HHS, FDA, CENTER FOR DRUG EVALUATION AND RESEARCH, *Guidance for FDA Staff and Industry, Marketed Unapproved Drugs Compliance Policy Guide, Sec. 440.100*

*Marketed New Drugs Without Approved NDAS or ANDAs*, at 4 – 5 (Sep. 19, 2011) (emphasis original).[18]  In sum, over the past several decades, the FDA has put the drug industry on notice of its enforcement priorities in its effort to remove illegal drugs from the market.  In 2006, before TRICARE awarded ESI the TPharm contract, the FDA put the industry on further  notice that it was going to take even more aggressive steps to remove unapproved drugs from the market.  As an industry leader, ESI deploys sophisticated resources and professionals to follow the FDA's enforcement efforts to remove illegal drugs from the market.  Based upon information and belief, ESI has attended several seminars, along with other industry leaders, with the FDA in which the FDA provided the industry with notice of its enforcement efforts.  ESI representatives assigned to the TRICARE contracts attended seminars.

### 2.      FDA's Unapproved Drugs Initiative

66.      Starting in 2006, the FDA began implementing its Unapproved Drugs Initiative.  Given its limited resources, the FDA engaged in a multi-prong attack.  On one front, the FDA took enforcement actions against certain drug classes.  On another front, the FDA took action against particular firms.  Some manufacturers and distributors of illegal drugs have been criminally prosecuted.  In January 2007, the FDA confronted the industry face-to-face in the FDA's Marketed Unapproved Drugs Workshop,[19] where it once again provided the industry notice about its enforcement efforts.  ESI representatives attended this FDA workshop.  Private relators joined the fight by filing *qui tam* actions under the FALSE CLAIMS ACT, in which the Government intervened, against manufacturers and distributors of these illegal drugs.

---

[18]  The 2011 CPG is available at
<http://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm074382.htm (last visited Sep. 3, 2012).  The 2006 CPG is essentially the same.
[19]  The presenters included the Commissioner of the FDA, Dr. Andrew C. von Eschenbach, MD and the Director of the FDA's Center for Drug Evaluation and Research, Dr. Steven Galson, MD, and Ms. Deborah M. Autor, Esq.  The materials are available online at
http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/SelectedEnforcementActionsonUnapprovedDrugs/ucm228681.htm> (last visited Sep. 3, 2012).

### 3. FDA Enforcement Actions by Drug Class

67.    Since it implemented its Unapproved Drugs Initiative, the FDA has taken enforcement

action against these unapproved drugs:

| | |
|---|---|
| **Balanced Salt Solution** (ophthalmic) Products | Unapproved **Narcotics** Containing Morphine Sulfate, Hydromorphone, or Oxycodone |
| **Carbinoxamine** Drug Products | Unapproved **Nitroglycerin** Sublingual Tablets |
| **Codeine** Sulfate Tablets | Unapproved **Ophthalmic** Drug Products |
| **Colchicine** Products | Unapproved **Oxycodone** Single-Ingredient, Immediate Release Drug Products for Oral Administration |
| **Cough, Cold, and Allergy** Products | |
| **Epinephrine** 0.3 mg prefilled single dose syringe | Topical Drug Products Containing **Papain Quinine** Sulfate Drug Products |
| **Ergotamine**-Containing Drug Products | **Trimethobenzamide** Hydrochloride Suppositories |
| Timed-Release Drug Products Containing **Guaifenesin** | |
| **Hydrocodone** Drug Products | |

### 4. FDA Enforcement Actions by Firm

68.    Under its Unapproved Drugs Initiative, the FDA has taken enforcement action against

these firms that are marketing or distributing unapproved drugs:

| | |
|---|---|
| Abraxis Bioscience, Inc. | Neilgen Pharmaceuticals, Inc. |
| Actavis Totowa, LLC | Nexgen Pharma, Inc. |
| Amerifit Brands, Inc. | Ohm Laboratories, Inc. |
| ANIP Acquisition Company | PharmaFab, Inc. |
| Bryant Ranch Prepac | Pharmakon Laboratory, Inc. |
| Claris Lifesciences, Limited | Pharma Pac, LLC |
| Concord Laboratories, Inc. | PrimaPharm, Inc. |
| Contract Pharmacal Corporation | Provident Pharmaceuticals, LLC |
| C. R. Canfield Co., Inc. | River's Edge Pharmaceuticals, LLC |
| Deltex Pharmaceuticals, Inc. | RGH & Company Inc., dba Vital Nutrients |
| Deston Therapeutics | Scientific Laboratories, Inc. |
| Elge, Inc. | Sheffield Laboratories, Division of Faria Limited LLC |
| G & W Laboratories, Inc. | |
| Hi-Tech Pharmacal Co., Inc. | Sunrise Pharmaceutical, Inc. |
| Hill Dermaceuticals, Inc. | Syntho Pharmaceuticals, Inc. and Intermax Pharmaceuticals, Inc. |
| IriSys, Inc. | |
| Keystone Pharmaceuticals | Time-Cap Laboratories, Inc. |
| KV Pharmaceutical Company | Tri-Med Laboratories, Inc. |
| McGuff Pharmaceuticals, Inc. | Vintage Pharmaceuticals, LLC |
| Midland Pharmaceutical LLC | Vita-Erb, Ltd. |
| Neil Laboratories, Inc. | |

### 5.     False Claims Act Cases Involving Unapproved Drugs

69.     Four *qui tam* cases under the FALSE CLAIMS ACT against these manufacturers and

distributors of unapproved drugs have been made public.  They are:

a.     Drug maker Forest Laboratories, Inc. pled guilty and agreed to pay the United States more than $313 million to resolve criminal charges of its marketing Levothroid, which had not been approved by the FDA.[20]

b.     The United States intervened in a *qui tam* case against Healthpoint, LTC alleging that it unlawfully marketed the drug Xenaderm.[21]

c.     Drug maker Schwartz Pharma settled a FALSE CLAIMS ACT case for $22 million for its illegal distribution of Deponit and Hysocyamine Sulfate ER.[22]

d.     Drug maker Cypress Pharmaceuticals, Inc. settled a FALSE CLAIMS ACT case for the illegal distribution of FDA-unapproved drugs (Hylira, a gel used for the treatment of dry skin; Zaclir, an acne treatment; and Zacare, another acne treatment.)[23]

### 6.     FDA Unapproved Drug Workshop

70.     On January 9, 2007, the FDA brought together industry leaders in its "Marketed

Unapproved Drugs Workshop" to fully address the FDA's continuing concerns about the illegal

marketing and distribution of unapproved drugs.  ESI representatives, who were assigned to the

TPharm contract, attended this workshop.  These FDA leaders briefed industry: the FDA

Commissioner. Andrew C. von Eschenbach, M.D.; the Director of Center for Drug Evaluation

and Research, Dr. Steven Galson, M.D.; and the Director, Office of Compliance, Ms. Deborah

---

[20] *See* Department of Justice Press Release (Sep. 15, 2010), available at http://www.fda.gov/ICECI/CriminalInvestigations/ucm226396.htm> (last visited Sep. 3, 2012).
[21] *See* Department of Justice Press Release (Apr. 1, 2011), available at http://www.justice.gov/opa/pr/2011/April/11-civ-412.html> (last visited Sep. 3, 2012).
[22] *See* Department of Justice Press Release (Apr. 29, 2010), available at <http://www.justice.gov/opa/pr/2010/April/10-civ-499.html > (last visited Sep. 3, 2012).
[23] *See* Department of Justice Press Release (Mar. 28, 2012), available at < http://www.justice.gov/opa/pr/2012/March/12-civ-389.html > (last visited Sep. 10, 2012).

M. Autor, Esq.  A transcript of the workshop and the presentations are posted on the FDA's

webpage.[24]  In his opening remarks, FDA Commissioner Dr. von Eschenbach stated:

> FDA is committed to the mission of protecting and promoting
> public health and unapproved drugs can be, and are at times, a
> significant public health issue because unapproved drugs may not
> meet modern standards for safety, efficacy, quality and labeling.
> And, our unapproved drugs initiative is an integral part of our
> overarching commitment to drug safety and our drug safety
> initiative.

71.     The Workshop's presentations put the industry on further notice of the magnitude of the

unapproved drug problem (it is estimated that two percent of all prescriptions are written for

unapproved drugs), emphasized associated health risks from unapproved drugs, and outlined the

FDA's enforcement efforts to remedy the problem.  ESI's representatives, who were assigned to

the TPharm contract account, attended the FDA workshop.

## VIII.     THE LAW PROHIBITS TRICARE COST SHARING UNAPPROVED DRUGS

## A.     By Law, TRICARE Cannot Cost Share Unapproved Drugs

72.     As discussed above, thousands of drugs are illegally marketed and distributed in the

United States.  As revealed in this case, ESI profits from the sale and distribution of unapproved

drugs, to the detriment of the United States' fisc and the health of military service members and

their family members.  TRICARE cannot cost share FDA-unapproved drugs.  ESI had a financial

incentive, however, to approve ineligible prescription claims to be dispensed because it could

then invoice the Government for that service.  Thus, rather than reject ineligible claims, ESI

instead approved them.  Moreover, §C.5.14.2 of the TPharm contract required ESI to implement

an effective method to detect fraud.  Instead of stopping these fraudulent claims, ESI, in its

capacity as TRICARE's fiscal intermediary, caused to be presented false claims by its retail

---

[24] Available at
<http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/SelectedEnforcementActionsonUnapprovedDrugs/ucm228681.htm > (last visited Sep. 15, 2012).

pharmacy partners to the Government.  By these means, ESI caused to be presented false or fraudulent claims for Government payment.  31 U.S.C. §3729(a)(1)(A).

73.     TRICARE regulations, codified in the Code of Federal Regulations after public notice in the federal register, state "CHAMPUS[25] benefits may not be extended for drugs not approved by the U.S. FDA for commercial marketing.  Drugs grandfathered[26] by the FDA & Cosmetic Act of 1938 may be covered under CHAMPUS as if FDA approved."  32 C.F.R. §199(d)(3)(vi)(B). This regulation, which has been in effect from 2002 to the present, prohibits TRICARE cost sharing of unapproved drugs and is explicitly incorporated into the TPharm contract.  Moreover, 32 C.F.R. §199 (g)(15) also restricts TRICARE cost sharing unapproved drugs.

> (g)  *Exclusions and limitations*.  In addition to any definitions, requirements, conditions, or limitations enumerated and described in other sections of this part, the following specifically are excluded from the Basic Program:
>
> (15)  *Unproven drugs, devices, and medical treatments or procedures*.  By law, CHAMPUS can only cost-share medically necessary supplies and services.  Any drug, device, or medical treatment or procedure, the safety and efficacy of which have not been established, as described in this paragraph (g)(15), is unproved and cannot be cost-shared by CHAMPUS except as authorized under paragraph 199.4(e)(26)[27] of this part.
>
>> (i)  A drug, device, or medical treatment or procedure is unproven:
>>
>>> (A)  If the drug or device cannot be lawfully marketed without the approval or clearance of the United States Food and Drug Administration (FDA) and approval or clearance for marketing has not been given at the time the drug or device is furnished to the patient.

---

[25]  TRICARE was called CHAMPUS up until 2001.  At times, the two titles are used interchangeably.
[26]  The FDA has concluded that virtually no drugs are grandfathered.  *See* ¶63, *supra*.
[27]  This subsection is inapplicable here because it relates to drugs used in clinical trials sponsored or approved by the National Institutes of Health National Cancer Institute.

74.     Compliance with these laws is a material condition of Government payment.  Section C.4.1 of TPharm states "32 C.F.R. 199 are incorporated by reference and made part of the contract."  TPHARM CONTRACT at §C.4.1.

75.     Other TRICARE regulations also explicitly exclude unapproved drugs as TRICARE benefit.  TRICARE Policy Manual 6010.54-M, ch. 1, §2.1, ¶(I)(A), states "[a]ny drug . . . whose safety and efficacy has not been established is unproven and excluded from coverage."  Chapter 8, Section 9.1 is the applicable section of TPM 6010.57-M, which sets out TRICARE's prohibition on cost sharing unapproved drugs, states:

> 2.2  General Prescription Coverage
>
> 2.2.1   The Pharmacy Benefits Program generally requires mandatory substitution of generic drugs in accordance with 32 CFR 199.21(j)(2).  If state law prohibits generic substitution on drugs, the contractor, at the direction of the government, shall be able to process the brand product.
>
> 2.2.4  Labeled Indications.  Pharmaceutical agents[28] may be cost-shared when:
>
> - The pharmaceutical agent is approved for marketing by the U.S. Food and Drug Administration (FDA);
>
> - The pharmaceutical agent is prescribed by a provider, acting within the scope of his/her license, for its labeled indication; *and*
>
> - The pharmaceutical agent is furnished by a provider in accordance with all applicable state laws and licensing requirements.
>
> 2.2.5  Coverage *may also* be considered for unlabeled or off-label uses of drugs that are FDA approved drugs that are used for indications or treatments not included in the approved labeling.   Approval for reimbursement of unlabeled or off-label uses requires review for medical necessity, and also requires demonstrations from medical literature,

---

[28] 10 U.S.C. §1074G(g)(2) defines "pharmaceutical agent" as "drugs, biological products, and medical devices under the regulatory authority of The Food and Drug Administration."   Title 10 is where statutes regulating the Department of Defense are codified.   Section 1074G of Title 10 establishes the DoD's pharmacy benefits program.

national organizations, or technology assessment bodies that the unlabeled or off-label use of the drug is safe, effective, and in accordance with nationally accepted standards of practice in the medical community.  As presented in order of relative weight in 32 CFR 199.2, reliable evidence means:

- Well controlled studies of clinical meaningful endpoints, published in refereed medical literature.

- Published formal technology assessments.

- Published reports of national professional medical associations.

- Published national medical policy organizations.

- Published reports of national expert opinion organizations.

2.2.6  Pharmaceutical agents grandfathered by the Federal Food, Drug and Cosmetic Act of 1938 may be cost-shared as if FDA approved.

TRICARE Policy Manual 6010.57-M, Feb. 1, 2008, Chapter 8, Section 9.1 (emphasis added).

While Chapter 8, Section 9.1 permits TRICARE to cost share drugs approved by the FDA for off label uses, the drugs dispensed by ESI cannot be cost shared because they have ***no*** label—that is, they have not been approved by the FDA.  ESI dispensed, caused to be dispensed, or approved to be dispensed, drugs unapproved by the FDA.  Acting as TRICARE's fiscal intermediary, TRICARE used Government funds to pay for these unapproved, unlabeled drugs and then submitted a bill to the Government for doing so.

76.     Compliance with these laws is a material condition of payment.  The TPharm contract states **"**[a]dditionally, the following TRICARE manuals are incorporated by reference: []

TRICARE Policy Manual (TPM) 6010.57-M, dated Feb. 1, 2008, through change 4 . . .

TRICARE Operations Manual (TOM) 6010.56-M, dated Feb. 1, 2008, through change 4.  *The documents form an integral part of this contract and have the same force and effect as is set forth in full text.*"  TPHARM CONTRACT at §C.4.2 (emphasis added).  ESI's actions of using

Government funds to pay retail pharmacies their product costs and dispensing fees are false or fraudulent claims under 31 U.S.C. §3729(a)(1)(A).  ESI's subsequent actions of presenting an invoice seeking payment for administrative fees associated with approving the dispensing of unapproved drugs by its retail pharmacy partners are false or fraudulent claims under 31 U.S.C. §3729(a)(1)(A) or 31 U.S.C. §3729(a)(1)(B), or both.

**B.    Contractual Terms Prohibit ESI From Causing TRICARE to Cost Share Unapproved Drugs**

77.    Material terms of the TPharm contract also prohibit cost sharing of unapproved drugs. For example, section C.1 of the TPharm contract states ESI will "perform as a fiscal intermediary on behalf of DoD to pay for all *authorized pharmaceuticals* and supplies dispensed for eligible beneficiaries at retail pharmacies."  Section C.1.1 states "[t]he Government will be acquiring *covered drugs* and procuring them for the use of the Federal Government in support of this contract with Government funds."  Sections C.4.1, C.4.2, which incorporate CFR regulations and TRICARE manuals that prohibit cost sharing of FDA-unapproved drugs, state "[t]hese documents form an integral part of this contract and have the same force and effect as if set forth in full text.").  Section C.5.2.4.1 explicitly incorporates TRICARE Policy Manual, Chapter 8, Section 9.1, which prohibits TRICARE cost sharing of FDA-unapproved drugs.  Finally, section C.5.2.4.4 states only "covered pharmaceutical agents" are covered by TRICARE.

78.    Likewise, the TRRx contract prohibits cost sharing of FDA-unapproved drugs.  TRRx CONTRACT at §C.1.1 (stating "DoD will be acquiring *covered drugs* and procuring them for the use of the Federal Government with DoD funds.) (emphasis added); *id.*. at §C.1.3 (stating "[t]he contractor shall comply with the policies specified in the TRICARE Policy Manual 6010.54-M at Attachment 1, Section J, including all changes."  This manual prohibits TRICARE cost sharing

of FDA-unapproved drugs.).   As with TPharm, TRRx's contractual terms permit TRICARE to cost share "covered drugs" only—unapproved drugs and most non-drugs are ineligible for TRICARE cost sharing.  TRRx CONTRACT at §C.1 (stating "The [Pharmacy Benefits Manager— ESI] will issue DoD funds to pay for each TRICARE prescription after receiving the Government's verification of the individual beneficiary's eligibility and authorization for payment.  Therefore, DoD will be acquiring *covered drugs* and procuring them for the use of the Federal Government with DoD funds.") (emphasis added).   Other sections of the TRRx contract state that TRICARE will not cost share unapproved drugs.  TRRx CONTRACT at §C.1.1 (stating "DoD will be acquiring *covered drugs* and procuring them for the use of the Federal Government with DoD funds.") (emphasis added); *id.*. at §C.1.3 (stating "[t]he contractor shall comply with the policies specified in the TRICARE Policy Manual 6010.54-M at Attachment 1, Section J, including all changes.").  In sum, TRICARE regulations exclude from coverage drugs that have not been approved by the FDA to be both safe and effective.

79.     To further underscore the seriousness of this case, the distribution of drugs unapproved by the FDA violates the FOOD, DRUG AND COSMETIC ACT, 21 U.S.C. §355(a), and exposes the offender to criminal liability, 21 U.S.C. §331(a).

## C.     The Unapproved Drugs ESI Caused TRICARE to Cost Share

80.     Attached at Appendix C is a spreadsheet that lists the unapproved drugs ESI dispensed (mail) and approved to be dispensed by its retail pharmacy partners (retail).

81.     ESI dispensed the unapproved drugs listed in the spreadsheets identified above.  Even though these unapproved drugs are ineligible for TRICARE cost sharing, ESI approved them to be dispensed.  ESI's action resulted in over 3,124,465 prescriptions for unapproved drugs to be dispensed, causing the TRICARE to pay $82,132,561 in product cost.  In addition, for retail

claims, ESI used Government funds to remit payment to its retail pharmacy partners their

dispensing fees, the full cost of which is to be determined because of ESI's ongoing fraud.  In

addition, ESI submitted invoices to the Government for its services adjudicating these claims

(both under mail and retail), the full cost of which is to be determined because of ESI's ongoing

fraud.  Based upon information and belief, these claims are ongoing and the Government

continues to be harmed.  This chart summarizes these false claims.

| UNAPPROVED DRUGS DISPENSED BY ESI INELIGIBLE FOR TRICARE COST SHARING | | |
|---|---|---|
| **Contract** | **# of prescriptions** | **Product Cost ESI Caused the Government to Incur** |
| **TMOP** | 106,276 | $5,719,420 |
| **TPharm - Retail** | 1,480,944 | $41,079,337 |
| **TPharm – Mail** | 72,486 | $8,705,166 |
| **TRRX** | 1,464,759 | $26,628,639 |
| **Grand Total** | **3,124,465** | **$82,132,561** |

82.    Many of these unapproved drugs dispensed by ESI have been the subject of an

enforcement action taken by the FDA.

a.    For example, ESI dispensed and approved claims for unapproved cough, cold, and

allergy drugs, which have been the subject of FDA enforcement actions. [29]  See the chart

immediately below.

---

[29] *Compare* FDA, *Drugs for Human Use; Unapproved and Misbranded Oral Drugs Labeled for Prescription Use and Offered for Relief of Symptoms of Cold, Cough, or Allergy, Enforcement Action Dates*, FDA-2011-N-0100, Fed. Reg. Vol. 76, No. 42 (Mar. 3, 2011), *with* Appendices C(1) – C(4).

| Drug/Drug Class and Background Information | Government Action, Federal Register Notices, Warning Letters, Safety Alerts | Number of Claims | Cost to TRICARE |
|---|---|---|---|
| **Cold, Cough, Allergy**: ESI caused TRICARE to cost share claims for unapproved prescription products containing ingredients in the following categories: carbinoxamine, tannates, and products with ingredients not covered by the related OTC-Monograph for cold, cough, and allergy<br><br>FDA took action in 2006 and 2011 regarding certain unapproved oral cold, cough, and allergy products, noting in some cases products were marketed for use in infants and other patients without sufficient evidence of the drugs' effectiveness or safety.<br><br>▪ FDA Drug Class Enforcement Action: Carbinoxamine – June 2006 (including infant deaths)<br><br>▪ FDA Drug Class Enforcement Action March 2011<br><br>▪ Examples of safety issues include: formulations, labeling, dosing, overlapping ingredients, potential manufacturing deficiencies, products marketed under same name but containing variable ingredients and concentrations | Federal Register Notice of FDA Enforcement Action 2006: Carbinoxamine Enforcement http://www.fda.gov/OHRMS/DOCKETS/98fr/E6-9033.pdf<br><br>Federal Register Notice of FDA Enforcement Action 2011: Cold, Cough, Allergy http://www.gpo.gov/fdsys/pkg/FR-2011-03-03/pdf/2011-4703.pdf<br><br>Product Listings, 2011: http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/SelectedEnforcementActionsonUnapprovedDrugs/ucm245106.htm | 704,870 | $32,155,485.96 |

b.      ESI dispensed and approved claims for colchicine oral tablets, which is an

unapproved drug that has been the subject of FDA action.  See the chart immediately below.

| Drug/Drug Class and Background Information | Government Action, Federal Register Notices, Warning Letters, Safety Alerts | Number of Claims | Cost to TRICARE |
|---|---|---|---|
| **Colchicine Oral Tablets**<br>▪ FDA Safety Alert in 2009 following FDA approval of first single-ingredient oral colchicine product<br><br>▪ FDA Drug Class Enforcement Action:  2010<br><br>▪ Manufacturer warning letters in 2006, 2010<br><br>▪ Examples of safety issues include: unapproved products not labeled with serious and potentially fatal drug and dietary interactions, labeled dosing | FDA Safety Alert (2009): http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/DrugSafetyInformationforHeathcareProfessionals/ucm174315.htm<br><br>Federal Register Notice of FDA Enforcement Action (2010): http://www.gpo.gov/fdsys/pkg/FR-2010-10-01/html/2010-24684.htm<br><br>FDA Warning Letter (2006) to Concord Laboratories: http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2006/ucm075988.htm<br><br>FDA Warning letter (January 2010) Sunrise Pharmaceutical: http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm197966.htm | 386,692 | $3,291,293.49 |

c.      ESI dispensed and approved claims for Auralgan, an unapproved drug which has

been the subject of FDA action.  See the chart immediately below.

| Drug/Drug Class and Background Information | Government Action, Federal Register Notices, Warning Letters, Safety Alerts | Number of Claims | Cost to TRICARE |
|---|---|---|---|
| **Auralgan**<br>■  This drug has been the subject of FDA enforcement actions | Notice of Auralgan Seize:<br>http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm243638.htm<br><br>FDA Warning Letter to Deston Therapeutics regarding other unapproved drugs:<br>http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm203037.htm | 12,034 | $1,852,567.09 |

d.      ESI dispensed and approved claims for Nitroglycerin sublingual tablets, an

unapproved drug which has been the subject of FDA action.  See the chart immediately below.

| Drug/Drug Class and Background Information | Government Action, Federal Register Notices, Warning Letters, Safety Alerts | Number of Claims | Cost to TRICARE |
|---|---|---|---|
| **Nitroglycerin sublingual tablets**<br>■  Unapproved versions of nitroglycerin sublingual tablets were the subject of an FDA Drug Class Enforcement Action in 2010<br>■  The FDA announced significant quality and efficacy problems associated with some of the unapproved products of this drug class | FDA Enforcement Action (2010) Nitroglycerin sublingual tablets:<br>http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2010/ucm204744.htm<br><br>FDA Warning Letter (2010) to Konec:<br>http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2010/ucm204546.htm.<br><br>FDA Warning Letter (2010) to Glenmark:<br>http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2010/ucm204540.htm<br><br>FDA Warning Letter (2006) to Concord Laboratories:<br>http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2 | 180,562 | $1,351,968.61 |

| | | | |
|---|---|---|---|
| | 006/ucm075988.htm | | |

e.      ESI dispensed and approved claims for Nitroglycerin sublingual tablets, an

unapproved drug which has been the subject of FDA action.  See the chart immediately below.

| Drug/Drug Class and Background Information | Government Action, Federal Register Notices, Warning Letters, Safety Alerts | Number of Claims | Cost to TRICARE |
|---|---|---|---|
| **Nitroglycerin oral capsules**<br>■   While some products of this drug class purportedly were approved on the basis of safety or may have entered market as IRS between 1938-1962, in 1999, the FDA reclassified these products through DESI to "lacking substantial evidence of efficacy" for labeled indications and pre-1962 approval waswithdrawn | Federal Register /Vol. 64, No. 75; 19373-5; Tuesday, April 20, 1999 /Notices. Available at: http://www.gpo.gov/fdsys/pkg/FR-1999-04-20/pdf/99-9770.pdf | 93,103 | $1,507,277.07 |

f.      ESI dispensed and approved claims for Ergotamine-containing products, which

are unapproved drugs that have been the subject of FDA action.  See the chart immediately

below.

| Drug/Drug Class and Background Information | Government Action, Federal Register Notices, Warning Letters, Safety Alerts | Number of Claims | Cost to TRICARE |
|---|---|---|---|
| **Ergotamine-containing products:**<br>■   This drug class was the subject of a FDA Drug Class Enforcement Action in 2007<br>■   Safety concerns included unlabeled serious and potentially fatal drug interactions, as well as inadequate warning labels leading to morbidity and mortality | FDA Enforcement Announcement (2007): http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2007/ucm108857.htm | 31,081 | $622,965.40 |

g.      ESI dispensed and approved claims for Xenaderm, an unapproved drug which has

been the subject of False Claims Act action.  See the chart immediately below.

| Drug/Drug Class and Background Information | Government Action, Federal Register Notices, Warning Letters, Safety Alerts | Number of Claims | Cost to TRICARE |
|---|---|---|---|
| **Xenaderm**<br>▪ The Department of Justice intervened in a False Claims *qui tam* action against Healthpoint for its illegal distribution of this drub | Department of Justice Press Release (2011):<br>http://www.justice.gov/opa/pr/2011/April/11-civ-412.html | 25,580 | $1,383,155.56 |

h.      ESI dispensed and approved claims for Papin-containing topical products,

unapproved drugs which have been the subject of FDA action.  See the chart immediately below.

| Drug/Drug Class and Background Information | Government Action, Federal Register Notices, Warning Letters, Safety Alerts | Number of Claims | Cost to TRICARE |
|---|---|---|---|
| **Papain-containing topical products**<br>▪ Papain-containing products were the subject of an FDA Drug Class Enforcement action in 2008 products<br>▪ Products with these ingredients were determined to be less than effective and safety issues regarding allergic reactions were found | FDA Enforcement Action (2008) Topical products containing Papain:<br>http://edocket.access.gpo.gov/2008/pdf/E8-22300.pdf | 16,530 | $944,266.13 |

i.      ESI dispensed and approved claims for Zaclir, Zacare, Hylira topical products, an

unapproved drug which has been the subject of FDA action.  See the chart immediately below.

46

| Drug/Drug Class and Background Information | Government Action, Federal Register Notices, Warning Letters, Safety Alerts | Number of Claims | Cost to TRICARE |
|---|---|---|---|
| **Zaclir, Zacare, Hylira topical products**<br>■ These drugs were the subject of a Department of Justice intervened qui tam action under the False Claims Act | Department of Justice Press Release (2012): http://www.justice.gov/opa/pr/2012/March/12-civ-389.html | 9,032 | $879,820.83 |

      j.     ESI dispensed and approved claims for Hyoscyamine ER, an unapproved drug which has been the subject of a False Claims Act action.  See the chart immediately below.

| Drug/Drug Class and Background Information | Government Action, Federal Register Notices, Warning Letters, Safety Alerts | Number of Claims | Cost to TRICARE |
|---|---|---|---|
| **Hyoscyamine ER**<br>■ These drugs were the subject of a Department of Justice intervened qui tam action under the False Claims Act | Department of Justice Press Release (2010): http://www.justice.gov/opa/pr/2010/April/10-civ-499.html | 9,221 | $891,757.76 |

      k.     The FDA has taken enforcement action against unapproved drugs manufactured and marketed by Actavis Totowa, LLC.[30]  ESI dispensed many of the unapproved drugs listed by the FDA in its enforcement action against Actavis.  *Compare* FDA List of Unapproved New Drugs Manufactured by Actavis Totowa, LLC, *with* Appendix C.  Some of those drugs are: Chlordiazepoxide w/ Clidinium Bromide capsules, Hyoscyamine Sulfate 0.375mg SR tablets, and other unapproved drugs.

      l.     ESI dispensed and approved claims in the amount of $2,287,302 for these unapproved drugs:  CHLOR-MAL/METHSCOPOLAMINE NIT 4-8-2.5MG  TABLET SEQ -

---

[30] See  < http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/SelectedEnforcementActionsonUnapprovedDrugs/ucm228670.htm#actavis > (last visited Sep. 19, 2012).

1ST GENERATION ANTIHISTAMINE-ANTICHOLINERGIC COMBINATION.  These products have been the subject of FDA Enforcement Action 2011-N-0100.

m.     ESI dispensed and approved claims in the amount of $2,046,701 for these unapproved drugs:  PHENYLEPHRINE/CHLOR-TAN 25-9MG TABLET - 1ST GENERATION ANTIHISTAMINE-ANTICHOLINERGIC COMBINATION.  These products have been the subject of FDA Enforcement Action 2011-N-0100.

n.     ESI dispensed and approved claims in the amount of $2,032,226 for these unapproved drugs:  CHLORDIAZEPOXIDE/CLIDINIUM BR 5 MG-2.5MG CAPSULE - ANTICHOLINERGICS,QUATERNARY AMMONIU.  *Compare* FDA List of Unapproved New Drugs Manufactured by Actavis Totowa, LLC, *with* Appendix C.

o.     ESI caused TRICARE to cost share $1,922,915 for these unapproved drugs: CHLOR-MAL/PHENYLEPH/METHSCOP 8-40-2.5MG TAB ER SEQ - 1ST GEN ANTIHIST-DECONGEST-ANTICHOLINERGIC COM.  These products have been the subject of FDA Enforcement Action 2011-N-0100.

p.     The products listed above is merely a sample of the universe of unapproved drugs ESI dispensed (mail) or approved to be dispensed (retail), paid for by TRICARE in violation of TRICARE cost sharing regulations.

## IX.     ESI'S VIOLATIONS OF THE FALSE CLAIMS ACT

### A.     The False Claims Act

83.    This action is brought on behalf of the United States under the *qui tam* provisions of the FALSE CLAIMS ACT (FCA), 31 U.S.C. 3729, *et seq*.  The FCA permits relators to bring suit to redress fraud against the United States and share in any recovery.  31 U.S.C. §3730(b)(1).  The FCA is "the Government's primary litigative tool for combating fraud."  S. Rep. No. 345, 99th

Cong., 2d Sess. 2 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266.  The purpose in amending the FCA in 1986 was "not only to provide the Government's law enforcers with more effective tools, but to encourage any individual knowing of Government fraud to bring that information forward."  S. Rep. No. 99-345, at 2.

84.    The FCA imposes liability on any person who (A) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" or (B) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A)-(B).[31]   The FCA also imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. §3729(a)(1)(G) (this type of claim is commonly called a "reverse false claim"); *see also* THE PATIENT PROTECTION AND AFFORDABLE CARE ACT OF 2009 (H.R. 3590) (Mar. 23, 2010), §6402 (expanding the definition of "obligation" as defined in 31 U.S.C. §3729(b)(3); requiring overpayments to be reported *and returned* within 60 days of identity or the date a corresponding cost report is due, whichever is later; and deeming any overpayment retained after the 60-day deadline to be an "obligation" for purposes of the FCA).

85.    FCA defines the terms "knowing" and "knowingly" to include "actual knowledge of [particular] information," "deliberate ignorance of the truth or falsity of the information," and "reckless disregard of the truth or falsity of the information."  31 U.S.C. §3729(b)(1)-(3).

---

[31] The FCA was amended by THE FRAUD ENFORCEMENT AND RECOVERY ACT OF 2009 (FERA), Pub. L. No. 111-21, §4, 123 Stat. 1617, 1621 (2009).  FERA modified and renumbered the subsections of 31 U.S.C. §3729(a), but only the amendments to former Section 3729(a)(2) –now Section 3729(a)(1)(B) – were made retroactive.  Pub. L. No. 111-21, §4, 123 Stat. 1625.  That provision was designed "to clarify and correct erroneous interpretations of the law" in decisions such as *Allison Engine Co. v. United States ex rel. Sanders*, 128 S. Ct. 2123 (2008), *see* S. Rep. No. 111-10, 111th Cong., 1st Sess., at 10 (2009), and Congress thus specified that it "shall take effect as if enacted on June 7, 2008 . . . ."  Pub. L. No. 111-21, §4, 123 Stat. 1625.

86.     A person who violates the FCA is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461; Public Law 104-410) to $11,000, plus three times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. §3729(a)(1).

## B.     ESI's Violations of the False Claims Act

87.     By law and under the terms of the TPharm, TRRx, and TMOP contracts, TRICARE is not authorized to cost share most non-drugs (*e.g.*, over-the-counter drugs, medical foods, and supplements) and drugs unapproved by the FDA.  That is, Government funds cannot be used to pay for these products.  TRICARE contracted ESI to be its pharmacy benefits manager.  The Government paid ESI to filter out and deny prescription claims for products ineligible for TRICARE cost sharing.  Instead of performing its contractual duties and following the law, ESI approved claims ineligible for TRICARE cost sharing and then turned around and billed the Government for providing these worthless services.

88.     Under the Retail Program, ESI caused false claims to be presented:   ESI adjudicated and approved retail claims for unapproved drugs and non-drugs, causing TRICARE to cost share them.  Acting in its capacity as the Government's fiscal intermediary, ESI used Government funds to pay for drugs and non-drugs that were ineligible for TRICARE cost sharing.  ESI used Government funds to pay retail pharmacies for their product cost.  ESI also used Government funds to pay retail pharmacies fees to dispense these products.  By these means, ESI knowingly, as that term is defined in 31 U.S.C. 3729(b)(1)-(3), caused to be presented false claims to the Government.  ESI's actions of using Government funds to pay retail pharmacies their product costs and dispensing fees are false or fraudulent claims under 31 U.S.C. §3729(a)(1)(A).  ESI's

subsequent actions of presenting an invoice seeking payment for administrative fees associated with approving the dispensing of products ineligible for TRICARE cost sharing by its retail pharmacy partners are false or fraudulent claims under 31 U.S.C. §3729(a)(1)(A) or 31 U.S.C. §3729(a)(1)(B), or both.

89.    Under the Retail and Mail Order Programs, ESI made false statements material to false claims:

a.    Adjudication fees (retail):    Pursuant to the cost-plus reimbursement clauses of the TPharm and TRRx contracts, ESI knowingly presented invoices to the Government for administrative fees associated with retail prescriptions dispensed by ESI retail pharmacy partners.  These invoices were false because the products ESI approved to be dispensed were ineligible for TRCIARE cost sharing.  Government payment to ESI was conditioned upon its compliance with TRICARE regulations and contractual terms that prohibit cost sharing of products ineligible for TRICARE cost sharing.   Compliance with these cost sharing rules was material to the Government's decision to pay.  Had the Government known ESI failed to comply with these rules, it would not have paid.  ESI's false invoices (TEDs) are false or fraudulent claims under 31 U.S.C. §3729(a)(1)(A) or 31 U.S.C. §3729(a)(1)(B), or both.

b.    Dispensing fees (mail order): Pursuant to the cost-plus reimbursement clauses of the TPharm and TMOP contracts, ESI knowingly presented false invoices to the Government for dispensing products ineligible for TRICARE cost sharing.  These invoices were false because the products ESI dispensed were ineligible for TRICARE cost sharing.  Government payment to ESI was conditioned upon its compliance with TRICARE regulations and contractual terms that prohibit cost sharing of these products.  These cost sharing rules were material to the Government's decision to pay ESI.  ESI's false invoices (TEDs) are false or fraudulent claims under 31 U.S.C. §3729(a)(1)(A) or 31 U.S.C. §3729(a)(1)(B), or both.

90.   <u>Reverse False Clams</u>:  ESI was not entitled to the money it received as a result of its false claims submitted for administrative fees (retail) and dispensing fees (mail order) associated with products ineligible for TRICARE cost sharing.  ESI had an obligation, as defined in 31 U.S.C. §3729(b)(3), to return within 60 days these overpayments.  ESI committed "reverse false clams," 31 U.S.C. §3729(a)(1)(G), when it knowing and improperly avoided its obligation to return this money to the Government.

91.   <u>Fraud in the Inducement</u>:  Based upon information and belief, ESI fraudulently induced TRICARE to award it the TPharm contract; such conduct amounts to a false claim under 31 U.S.C. §3729(a)(1)(A) or 31 U.S.C. §3729(a)(1)(B), or both.

    a.     Upon its acceptance of the contract, ESI certified the following:

> Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein.  The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein.

TPHARM CONTRACT at item 17 ("Contract's Negotiated Agreement").  Compliance with this certification was a condition or prerequisite to a Government payment.  ESI's certification was false because ESI knowingly failed to deliver all items or perform all the services identified in the contract yet requested and received Government payment.

    b.     Liability can also be imposed under the FALSE CLAIMS ACT because ESI violated the TRUTH IN NEGOTIATIONS ACT (TINA), 10 U.S.C. § 2306a.  TINA, together with its implementing regulations, require contractors in negotiated procurements such as TPharm, to disclose and certify that disclosed details concerning expected costs ("cost or pricing data") are accurate, current and complete.  Based upon information and belief, ESI was required to submit a

Certificate of Current Cost or Pricing Data using the format found at FEDERAL ACQUISITION

REGULATION (FAR) §15.406-2(a).  *See* 10 U.S.C. § 2306a(a)(2).  The certificate was due as soon

as practicable after the date the parties conclude negotiations and agree to a contract price.  FAR

§15.406-2(a).  Even if ESI failed to certify its cost or pricing data, that omission does not relieve

it of liability for defective pricing.  10 U.S.C. § 2306a(f)(2).  Based upon information and belief,

the information ESI provided to TRICARE in connection with the negotiations of the TPharm

contract was knowingly inaccurate, incomplete, not current, and misled TRICARE contracting

officials.  TRICARE relied upon the accuracy of the disclosures in negotiating the TPharm

contract.  ESI's defective disclosures led to TRICARE to paying higher prices for the services

called for under the TPharm contract.

      c.      TINA also required ESI provide the Government "cost or pricing data" in

connection with any contract negotiation.  10 USC §2306a (a)(2).  The term "cost or pricing

data" is defined by TINA as "all facts that, as of the date of agreement on the price of a contract

(or the price of a contract modification) . . . a prudent buyer or seller would reasonably expect to

affect price negotiations significantly."  10 USC §2306a (h)(1).  ESI was required to disclose

"accurate, complete and current data."  10 USC §2306a (a)(2).  This includes "all the facts that

can be reasonably expected to contribute to the soundness of estimates of future costs and to the

validity of determinations of costs already incurred."  FAR §2.101.  Because the duty to furnish

accurate, complete and current data is a duty imposed on Government contractors by a statute,

this duty cannot be waived.[32]  When ESI submitted its bid and in subsequent negotiations, ESI

was required to "certify that, to the best of the person's knowledge and belief, the cost or pricing

data submitted are accurate, complete, and current."  10 U.S.C. §2306a(a)(2).  ESI's compliance

---

[32] *See Singer v. United States*, 576 F.2d 905, 917 (Ct. Cl. 1978); *M-R-S Manufacturing Company v. United States*, 492 F.2d 835, 841 (Ct. Cl. 1974).

with TINA and its implementing regulations was is a condition or prerequisite to a Government

payment. ESI's false TINA's certifications amount to false claims under the FALSE CLAIMS ACT.

92.    <u>Manipulation of Retail Reimbursement Rates</u>:   Based upon information and belief, ESI

manipulated the reimbursement rates for drugs dispensed under the retail program.  Section H.1

of the TPharm contract provides:

> H.1 FINANCIAL INCENTIVES FOR ACTUAL RETAIL
> NETWORK REIMBURSEMENT COSTS H.1.1. The following
> table, Retail Network Reimbursement Table H-1, contains the
> "Guaranteed Average Price Adjustment Percentage" and
> "Guaranteed Average Dispensing Fee" proposed and guaranteed
> by the contractor for prescriptions for brand, generic, and specialty
> drug categories for each respective option period."   Under the
> "Guaranteed Average Price Adjustment Percentage" ESI must
> negotiate a predetermined maximum price for the products
> dispensed in their retail network.

It is believed that ESI manipulated the amount its pays pharmacies in order to meet other

financial obligations with ESI's retail pharmacy partners, to the financial detriment of the

Government.  ESI's actions of using Government funds to pay retail pharmacies a manipulated

retail reimbursement rate for its product costs are false or fraudulent claims under 31 U.S.C.

§3729(a)(1)(A).  ESI's actions are applicable to unapproved drugs (which ESI should not have

approved to be dispensed at all) and to approved drugs.

93.    As set forth below, ESI knew, as that term is defined in 31 U.S.C. §3729(b)(1),

TRICARE could not cost share FDA-unapproved drugs and non-drugs.

**C.    ESI Knew TRICARE Cannot Cost Share Non Drugs and Unapproved
Drugs and was Therefore Not Entitled to Government Payment for
Dispensing and Adjudicating Claims for Such Products**

94.    When performing adjudicating (retail) and dispensing (mail) services under the contracts,

ESI knew that the products the subject of this case were ineligible for TRICARE cost sharing.

ESI nevertheless approved retail claims and dispensed (mail) these products.  The following

nonexclusive list of factors show that ESI knew these products were ineligible for TRICARE

cost sharing.  These factors also show ESI knew, when it submitted invoices, that it failed to

comply with the law and contractual terms that prohibit TRICARE cost sharing these products.

95.     First, Relator Lawrence told ESI, telephonically, in person, and by email, that TRICARE

could not cost share FDA-unapproved drugs and non-drugs.  In response, ESI admitted it was

dispensing (mail) and approving retail claims for non-drugs and FDA-unapproved drugs, but told

Lawrence the law was "aspirational."  On behalf of ESI, Ryan Amundson, ESI Contracts

Administrator – TRICARE Division, responded to Relator Lawrence, and stated:

> ESI is aware of the provisions of TMA Policy Manual Chapter 8, Section
> 9.1 and believes that its practices comply with them in so far as it
> practicable to do so.  Paragraph 2.2.4 speaks of cost-sharing for drugs that
> are: (1) approved for marketing by the FDA; (2) used for their labeled
> indications; and (3) furnished by providers in accordance with applicable
> state laws and licensing requirements.  ***ESI regards this language as
> aspirational rather than prescriptive because each criterion or goal is not
> capable of being verified when adjudicating claims in real time***.  ESI
> does follow the procedure that has been the accepted standard of practice
> with TMA for years, which is that ESI blocks drugs at the direction of
> TMA.

In response, Relator Lawrence insisted that ESI stop dispensing non-drugs and unapproved drugs

and stop causing TRICARE to cost share them.  ESI nevertheless continued to dispense and

approve the dispensing of products ineligible for TRICARE cost sharing.

96.     Second, applicable TRICARE regulations state "[TRICARE] benefits may not be

extended for drugs not approved by the U.S. FDA for commercial marketing.  Drugs

grandfathered[33] by the FDA & Cosmetic Act of 1938 may be covered under CHAMPUS as if

---

[33]  The FDA estimates that virtually no drugs are grandfathered.  *See* U.S. DEPT. OF HEALTH & HUMAN SERVICES,
FDA, CENTER FOR DRUG EVALUATION AND RESEARCH, *Guidance for FDA Staff and Industry, Marketed
Unapproved Drugs—Compliance Policy Guide, Sec. 440.100, Marketed New Drugs Without Approved NDAs or
ANDAs* (June 2006) (hereinafter "2006 CPG"); *see also* 2011 CPG at 11 – 12 (same), available at
<http://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm074382.htm> (last visited
Sep. 4, 2012).

FDA approved." 32 CFR §199(d)(3)(vi)(B).  TRICARE regulations also prohibit the cost

sharing of drugs "the safety and efficacy of which have not been established."  32 C.F.R.

§199.4(g)(15).  These regulations, which prohibit TRICARE cost sharing of unapproved drugs,

are explicitly incorporated into the TPharm contract.  Section C.4.1 of TPharm states "32 C.F.R.

199 are incorporated by reference and made part of the contract."  TPHARM CONTRACT at §C.4.1.

97.    Third, the TPharm contract requires ESI to screen each prescription to determine whether

the drug is FDA approved.  Section C.5.7.1.1 of the TPharm contract requires ESI to perform

"prior authorizations for off-label uses IAW TPM, Ch. 8, §9.1, which states "[t]he contractor

shall perform prior authorization determinations regarding off-label use of pharmaceuticals in

accordance with the TRICARE Policy Manual (TPM), Chapter 8, Section 9.1."  Section 9.1 of

the TPM states that for labeled indications, the drug may only be cost shared when it is FDA-

approved; for off-labeled indications, the drug may only be cost shared when (1) the drug is

FDA-approved, and (2) the requisite medical necessity and safety and efficacy determinations

are made.  To comply with this contract provision, ESI was required to look at each prescription

and determine whether the prescribed use was "on" or "off" of the FDA-approved label.  To do

this, ESI would necessarily have to (1) compare the prescribed use with the FDA-approved use

for the specific FDA-approved drug, and if they were different, (2) look to see if the medical

necessity, safety and efficacy requirements were met.  Assuming ESI actually attempted to

comply with TPM Ch 8, Section 9.1, it knew that it was approving claims for unapproved drugs

because it would have checked to see if there was an FDA-approved labeled indication for each

and every drug.  There is only an FDA-approved use if the drug is, in fact, FDA approved.  If

ESI had been doing what it was paid to do and checking for approved indications, as required by

Section C.5.7.1.1, it would have determined that the drugs listed in Appendix C were FDA unapproved, and, hence, ineligible for TRICARE cost sharing.

98.     Fourth, ESI adjudicates pharmacy benefits for over 50 million Americans involving dozens of unique pharmacy benefits plans.  Each plan is different, whether it is a Medicaid plan or a plan for a union, the Federal Bureau of Investigation, Federal Employees Health Benefits Program, among others.   ESI builds a unique benefits package for each customer.  Some plans are generous; some plans not so much.  Each plan is unique and has different benefits.  ESI constructs its adjudication platform to match the allowable benefits under each unique plan.  By way of example, for some of its customers, ESI filters out expensive branded drugs for less costly generic drugs.

99.     Fifth, ESI maintains a robust state-of-art "adjudication platform."  On a daily basis, ESI enters all New Drug Codes into its "adjudication platform."  ESI has capability to program its adjudication platform to exclude all ineligible products from payment.  For TRICARE's plan, ESI knowingly constructed its adjudication platform to approve products ineligible for TRICARE cost sharing.  ESI had the capability, however, to filter out such products.  ESI chose not to because it billed and received Government payment for each product dispensed, even through the product was ineligible for TRICARE cost sharing.  At the point of sale, ESI determines whether a drug claim is paid based on (1) the ESI drug file, (2) the contract requirements, and (3) the formulary.  ESI builds coverage rules based on the contract requirements and the benefit design documents.  At the point of sale, ESI had the ability to deny the claim.  Instead, of rejecting these claims, as required by law, ESI approves them because the Government will pay ESI a fee for each product dispensed, assuming the product is eligible for TRICARE cost sharing.

100.    Sixth, some of the drugs ESI has adjudicated or dispensed have been the subject of an

FDA action, notice, or alert.  ESI closely monitors the FDA and the industry.  ESI knows which

drugs are unapproved and illegally distributed.

101.    Seventh, ESI representatives, who were assigned to the TPharm contract, attended

January 9, 2007, the FDA's "Marketed Unapproved Drugs Workshop," wherein the FDA

leadership briefed the industry about the FDA's its enforcement efforts regarding the illegal

marketing and distribution of unapproved drugs.

102.    Eighth, on or about April 17, 2009, ESI representatives, who were assigned to the

TPharm contract, attended an Academy of Managed Care Pharmacy Conference Unapproved

Drugs Seminar.  This seminar discussed the unapproved drug universe and that such products are

ineligible for government payment.

103.    Each enumerated factor alone shows that ESI knew that it was dispensing or approving to

be dispensed products that were ineligible for TRICARE cost sharing.

**D.    ESI submitted false invoices to be reimbursed for administrative fees associated with retail and mail prescriptions for products which could not be cost shared by TRICARE**

104.    After a product was dispensed, ESI then submitted invoices, using a TED, to the

Government for its services under the retail (adjudication fees) and mail (dispensing fees) order

programs.  "Submission of a TED to [TRICARE] is considered submittal of an invoice."  *See*

TPHARM CONTRACT at §G.8.1.1.  The TPharm contract, Section I, incorporated FEDERAL

ACQUISITION REGULATION (FAR) clause 52.232-1 ("Payments"), which states "[t]he

Government shall pay the Contractor, upon the submission of *proper invoices* or vouchers, the

prices stipulated in this contract for supplies delivered and accepted or services rendered and

accepted, less any deductions provided in this contract."  (emphasis added).  Under FAR §32.001

an "invoice payment" is defined as "a Government disbursement of monies to a contractor under a contract or other authorization for supplies or services accepted by the Government. (1) Invoice payments include— (i) Payments for partial deliveries that have been accepted by the Government; (ii) Final cost or fee payments where amounts owed have been settled between the Government and the contractor."

105.    Pursuant to the cost-plus reimbursement clauses of the TPharm and TRRx contracts, ESI presented an invoice, using a TED, to the Government requesting payment for an administrative fee associated with each prescription product dispensed by its retail pharmacy partners.  (A prescription could have multiple products, and, hence, multiple administrative fees.)  *See* TPHARM CONTRACT at §G.7.3.1.  Reimbursable administrative fees are listed in contract line numbers X004, X005, and X006.  *See* TPHARM CONTRACT at §G.8.1.

106.    Pursuant to the cost-plus reimbursement clauses of the TPharm and TMOP contracts, ESI submitted an invoice to the Government for each prescription product it dispensed by mail (dispensing fee).  *See* TPHARM CONTRACT at §G.7.3.1.  ESI submitted an invoice, using a TED, to the Government requesting a fee for each prescription product dispensed and mailed.  *See* TPharm Contract at §§G.5.3.6, G.10.1.  Mail order dispensing fees are listed in contract line number X001.  *See also* TPHARM CONTRACT at §G.8.1.

107.    Based upon information and belief, ESI expressly falsely certified that it had complied with the law and material terms of TPharm when submitting these invoices to the Government seeking payment for administrative fees (retail) and dispensing fees (mail) associated with products ineligible for TRICARE cost sharing.  Alternatively, through the act of submitting its invoices, ESI knowingly and falsely implied that it was entitled to payment.  ESI knowingly violated legal and contractual obligations, material to the government's decision to pay, when it

59

submitted invoices to the Government. ESI falsely impliedly certified in these invoices that it complied with the law and terms of the TPharm, TRRx, and TMOP contracts that prohibit TRICARE cost sharing illegal drugs and non-drugs. Such claims were false because ESI knew, when it presented its invoices to the Government, that it failed to comply with regulations and contractual terms that prohibit TRICARE cost sharing these products. Compliance with these TRICARE regulations and the contractual terms was a condition of payment. ESI's misrepresentation of its compliance with a precondition of payment was false or fraudulent. Compliance with the law and contract clauses was material to the Government's decision to pay ESI's invoices. The Government would not have paid these invoices had it known they were false. In so doing, ESI submitted false claims to the Government. ESI's false invoices amount to false claims under 31 U.S.C. §3729(a)(1)(A) or 31 U.S.C. §3729(a)(1)(B), or both.

108.    ESI knowingly violated legal and contractual obligations, material to the government's decision to pay, when it submitted these invoices. ESI falsely impliedly certified in these invoices that it complied with the law and terms of the TPharm, TRRx, and TMOP contracts that prohibit TRICARE cost sharing illegal drugs and non-drugs. Such claims were false because ESI knew, when it presented its invoices to the Government, that it failed to comply with regulations and contractual terms that prohibit TRICARE cost sharing these products. Compliance with these TRICARE regulations and the contractual terms was a condition of payment. ESI's misrepresentation of its compliance with a precondition of payment was false or fraudulent. Compliance with the law and contract clauses was material to the Government's decision to pay ESI's invoices. The Government would not have paid these invoices had it known they were false. In so doing, ESI submitted false claims to the Government. ESI's invoices violated 31 U.S.C. §3729(a)(1)(A) or 31 U.S.C. §3729(a)(1)(B), or both.

**E.    ESI's Caused False Claims to Presented to the Government When it Approved Claims at Retail for Drugs That Could Not Be Cost Shared by TRICARE**

109.    ESI established its own retail pharmacy network to administer the TRICARE pharmacy benefits program.  ESI had a long course of conduct with its retail pharmacy partners.  ESI adjudicated and approved retail prescription drug claims for products are ineligible for TRICARE cost sharing.  ESI authorized its retail pharmacy partners to dispense prescription drug claims for products ineligible for TRICARE cost sharing.  ESI used Government funds to pay retail pharmacies for the cost of these products.  ESI also used Government funds to pay retail pharmacies fees to dispense these products.  ESI's conduct caused the presentment of false claims by its retail pharmacy partners, which dispensed products ineligible for TRICARE cost sharing, paid for by the Government.  ESI's actions, in relation to its retail pharmacy partners, after having knowledge that the claims were false, amount to false claims under 31 U.S.C. §3729(a)(1)(A).[34]

110.    Moreover, ESI had an affirmative contractual duty to detect, stop, and report fraud.  *See* TPHARM CONTRACT at §C.5.14.2.  Instead of stopping and reporting fraud, ESI approved prescription claims for products ineligible for TRICARE cost sharing.  ESI adjudicated and approved retail prescription drug claims for products are ineligible for TRICARE cost sharing.  ESI used Government funds to pay retail pharmacies for the cost of these products.  ESI also used Government funds to pay retail pharmacies fees to dispense these products.  By these means, ESI caused to be presented false claims to the Government.   31 U.S.C. §3729(a)(1)(A).

**F.    ESI's Reverse False Claims**

---

[34] *See U.S. ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 701 (10th Cir. 2006).

111.    ESI had an affirmative duty to return to the Government the fees it improperly received under the mail order and retail programs related to claims involving products ineligible for TRICARE cost sharing.  ESI, however, has failed to return those overpayments.  ESI's failure to report and return these overpayments is deemed an "obligation."  Moreover, ESI had an affirmative duty to recoup Government funds it improperly remitted to its retail pharmacy partners.  Section C.2.1. of the TPharm contract requires ESI to administer the pharmacy benefits program in a fiscally responsible manner.  Section C.5.4 of the TPharm contract requires ESI to recoup erroneously paid Government funds.  Section C.5.4 of the TPharm provides "[t]he contractor shall implement a recoupment program in compliance with the [TRICARE Operations Manual], Chapter 10, to recoup erroneously paid Government funds . . . ."  ESI's failure recoup these overpayments it made on behalf of the Government is a reverse false claim.  In both scenarios, ESI knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government.  Government overpayments were made when ESI used Government funds to pay its retail pharmacy partners dispensing fees and product cost for products ineligible for TRICARE cost sharing.  Government overpayments were also made when ESI requested and received payment for administrative fees (retail) and dispensing fees (mail) for its services associated with products ineligible for TRICARE cost sharing.  ESI's actions amount to false claims under 31 U.S.C. §3729(a)(1)(G).

## G.    ESI Fraudulently Induced the Government to Award it the TPharm Contract

112.    ESI submitted a bid, as did three of its competitors, in response to TRICARE's solicitation for the TPharm contract.  Based upon information and belief, ESI certified to TRICARE that it: 1) was a responsible contractor, 2) was capable of performing, 3) would

deliver all services set forth in the solicitation and TPharm contract, 4) and would comply with all law and regulation applicable to the execution of the TPharm contract.

113. Based upon information and belief, ESI fraudulently induced TRICARE to award it the TPharm contract. Section K of the TPharm contract sets out some of the applicable certifications.

114. 31 U.S.C. §3729(a)(1)(A) prohibits the knowing submission to the Government of "a false or fraudulent claim for payment or approval." A false statement submitted in connection with a request for payment will render the claim "false or fraudulent" if the false statement is material to the government's funding decision. Under that standard, the false statements that ESI submitted in its bid to be awarded the TPharm contract were material to the government's decision to award the contract to ESI.

115. TRICARE awarded ESI the TPharm contract based in part upon ESI's false statements that it was a responsible contractor, was capable of performing, would deliver all services set forth in the solicitation, the statement of work, and TPharm contract, and would comply with all law and regulations applicable to the execution of the TPharm contract. Had TRICARE known that ESI had no intention in fulfilling its promises under the contract, it never would have contracted with ESI. Thus, every invoice ESI presented to the Government under the contract is a false claim within the meaning of 31 U.S.C. §3729(a)(1)(A), because the Government never would have contracted with ESI in the first place had it known the truth, and the Government also would not have paid the invoices had it known that ESI did not comply with material terms of the contract. ESI's false statements and all of the invoices is submitted to the Government under the contract violate 31 U.S.C. §3729(a)(1)(A). Alternatively, ESI knowingly submitted invoices for worthless services. Given that the Government would not have paid ESI one penny

had it known that ESI had no intent to comply with the contract, and if fact, did not meet its obligations under the contract, the Government is entitled to the full amount of the contract as damages.[35]

## H.   ESI Caused Substantial Damage to the Government

116.   ESI's violations of the FALSE CLAIMS ACT caused damage to the Government in the following ways:

a.   Retail:  under the retail pharmacy benefits program, ESI caused the Government to pay for products that are ineligible for TRICARE cost sharing.  ESI also caused the Government to pay its retail pharmacy partners fees associated with dispensing these products, the entire amount to be determined.  The Government paid ESI adjudication fees associated with prescription claims for products ESI approved to be dispensed, the amount of which is not listed here because of the confidentiality of such data.  ESI's false claims are ongoing.  The chart immediately below summarizes the Government's damages under the retail pharmacy benefits program:

---

[35]  Under a fraudulent inducement theory, although a defendant's claims for payment made under the contract were not literally false, because they derived from the original fraudulent misrepresentation, they, too, became actionable false claims.  *United States ex rel. Laird v. Lockheed Martin Eng'g & Science Servs. Co.*, 491 F.3d 254, 259 (5th Cir. 2007) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-44 (1943)); *see also United States ex rel. Longhi v. Lithium Power Technologies*, 575 F.3d 458 (5th Cir. 2009) (same).

| Contract | Product | # of claims | Product Cost[36] | Adjudication /Administrative Fees Paid to ESI[37] |
|---|---|---|---|---|
| **TPharm - Retail** | OVER-THE-COUNTER DRUGS | 88,655 | $1,966,957 | $█████████ |
| **TRRX** | OVER-THE-COUNTER DRUGS | 420,693 | $1,548,553 | $█████████ |
| **TPharm - Retail** | NON-PHARMACEUTICAL AGENTS | 4,201,801 | $256,966,473 | $█████████ |
| **TRRX** | NON-PHARMACEUTICAL AGENTS | 13,968,483 | $807,530,578 | $█████████ |
| **TPharm - Retail** | UNAPPROVED DRUGS | 1,480,944 | $41,079,337 | $█████████ |
| **TRRX** | UNAPPROVED DRUGS | 1,464,759 | $26,628,639 | $█████████ |
| | **Total** | **21,625,335** | **$1,135,720,537** | **$█████████** |

b.      Mail order:      under the mail order program, the Government paid ESI fees to adjudicate claims for products that are ineligible for TRICARE cost sharing.  The Government paid ESI dispensing fees associated with prescription claims for products ESI approved to be dispensed, the amount of which is not listed here because of the confidentiality of such data. The chart immediately below summarizes the Government's damages under the mail order pharmacy benefits program:

---

[36] The "product cost" includes the cost of the ingredient, plus the dispensing fee paid to the retail pharmacy, minus any co-pay collected from the beneficiary.

[37] The Adjudication / Administrative  / Media Fee is confidential.  In the abundance of caution, these figures are not publicly disclosed herein.  Damages are calculated by multiplying the reimbursement fee the Government pays ESI times the number of claims dispensed.

| Contract | Product | # of Claims Dispensed | Product Cost[38] |
|---|---|---|---|
| TPharm – Mail | OVER-THE-COUNTER DRUGS[39] | 744 | $76,121 |
| TMOP | OVER-THE-COUNTER DRUGS[40] | 645 | $15,872 |
| TPharm – Mail | NON-PHARMACEUTICAL AGENTS | 856,894 | $79,768,148 |
| TMOP | NON-PHARMACEUTICAL AGENTS | 1,805,400 | $239,379,805 |
| TPharm – Mail | UNAPPROVED DRUGS | 72,486 | $8,705,166 |
| TMOP | UNAPPROVED DRUGS | 106,276 | $5,719,420 |
| | | | |
| | Total | 2,842,445 | $333,664,532 |

c.     Reverse false claims:  all payments listed in the two charts immediately above were government overpayments, either directly received by ESI or passed through ESI to its retail pharmacy partners.  In addition, ESI had an affirmative duty to recoup Government funds it improperly remitted to its retail pharmacy partners.  ESI was obligated to return these overpayments to Government, which it has not done.

d.     Fraudulent inducement damages:     the Government is entitled to recoup all payments made by to ESI pursuant to the TPharm contract.

e.     Harm to patients:     some of the illegal drugs ESI be dispensed are known to cause patient harm.  The use of unapproved, illegally marketed drugs poses a serious health risk to patients.  The FDA has acknowledge this threat: "Right now, many unapproved drugs represent a public health threat because consumers wrongly assume that these widely marketed and available drugs are approved and have been found to be safe and effective by the FDA."

---

[38]  The "product cost" includes the cost of the ingredient, the dispensing fee paid by TRICARE to ESI, minus any co-pay collected from the beneficiary.
[39]  The over-the-counter drugs ESI dispensed or approved to be dispensed may have recently obtained an OTC monograph from the FDA.  At the time ESI approved claims related to these OTC products, they were unlawfully marketed as prescription drugs and dispensed under a prescription.  At some point, the product's manufacturer or distributor obtained a approval to market the product as an OTC drug.  Regardless, OTC products are ineligible for TRICARE cost sharing. *See* 32 C.F.R §199.4(d)(3)(vi)(A); TRICARE Policy Manual 6010.54-M, ch. 8, §9.1, ¶(II)(A); 32 C.F.R. §199.4(a)(1)(i) (restricting TRICARE benefits to "prescription drugs" only.).
[40]  *Id.*

FDA, Press Release, *FDA Acts to Improve Drug Safety and Quality* (June 8, 2006).  It is conceivable that ESI's fraudulent acts will cause future patient harm, the cost of care to be paid for by the Government.

## IX.    FIRST CAUSE OF ACTION

Administrative Fees Paid to ESI Associated with Prescriptions Dispensed at Retail
Involving Products Ineligible for Government Cost Sharing

117.    Relators re-allege and incorporate the allegations above as if fully set forth herein.

118.    ESI knowingly presented, or caused to be presented, false claims to the Government seeking payment for administrative fees associated with products, ineligible for TRICARE cost sharing, dispensed by its retail pharmacy partners.  In addition or in the alternative, ESI knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.  ESI requested and obtained payment for administrative fees associated with its approval of claims involving products ineligible for TRICARE cost sharing. Compliance with TRICARE cost sharing regulations and contractual terms were material conditions of the Government's decision to pay ESI administrative fees under the retail pharmacy benefits program.  Had the United States known that ESI failed to comply with these material obligations, the United States would not have paid ESI these fees.  The United States, unaware of the falsity of the claims, records, or statements, and in reliance on the accuracy thereof, made payments upon them, and was therefore damaged in an amount to be determined at trial.  ESI's actions are false claims under 31 U.S.C. §3729(a)(1)(A) or 31 U.S.C. §3729(a)(1)(B), or both.

119.    Based upon information and belief, ESI's wrongful actions are ongoing.

## X.     SECOND CAUSE OF ACTION

Dispensing Fees Paid to ESI Associated with Prescriptions Dispensed by Mail
Involving Products Ineligible for Government Cost Sharing

120.    Relators re-allege and incorporate the allegations above as if fully set forth herein.

121.    ESI knowingly presented, or caused to be presented, false claims to the Government seeking payment for dispensing fees associated with products, ineligible for TRICARE cost sharing, it dispensed under the mail order program.  In addition or in the alternative, ESI knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.  ESI requested and obtained payment for dispensing fees associated with its approval of claims for dispensing products ineligible for TRICARE cost sharing.  Compliance with TRICARE cost sharing regulations and contractual terms were material conditions of the Government's decision to pay ESI dispensing fees under the mail order pharmacy benefits program.  Had the United States known that ESI failed to comply with these material obligations, the United States would not have paid ESI these fees.  The United States, unaware of the falsity of the claims, records, or statements, and in reliance on the accuracy thereof, made payments upon them, and was therefore damaged in an amount to be determined at trial.  ESI's actions are false claims under 31 U.S.C. §3729(a)(1)(A) or 31 U.S.C. §3729(a)(1)(B), or both.

122.    Based upon information and belief, ESI's wrongful actions are ongoing.

## XI.     THIRD CAUSE OF ACTION

Payments to Retail Pharmacies for the Cost of Products Ineligible for Government Cost Sharing

123.    Relators re-allege and incorporate the allegations above as if fully set forth herein.

124.    ESI knowingly caused to be presented, false or fraudulent claims by its retail pharmacy partners for payment or approval.  In its capacity as TRICARE's fiscal intermediary and under the retail program of the TPharm and TRRx contracts, ESI approved to be dispensed products

68

ineligible for TRICARE cost sharing.  ESI used Government funds to pay its retail pharmacy partners their product cost, knowing such products were ineligible for TRICARE cost sharing. By these means, ESI caused to be presented false or fraudulent claims to the Government.  ESI's actions are false claims under 31 U.S.C. §3729(a)(1)(A).

125.     Based upon information and belief, ESI's wrongful actions are ongoing.

## XII.     FOURTH CAUSE OF ACTION

 Dispensing Fees Paid to Retail Pharmacies for Products Ineligible for Government Cost Sharing

126.     Relators re-allege and incorporate the allegations above as if fully set forth herein.

127.     ESI knowingly caused to be presented, false or fraudulent claims by its retail pharmacy partners for payment or approval.  In its capacity as TRICARE's fiscal intermediary and under the retail program of the TPharm and TRRx contracts, ESI approved to be dispensed products ineligible for TRICARE cost sharing.  ESI used Government funds to pay its retail pharmacy partners dispensing fees for products ineligible for TRICARE cost sharing.  By these means, ESI caused to be presented false or fraudulent claims to the Government.  ESI's actions are false claims under 31 U.S.C. §3729(a)(1)(A).

128.     Based upon information and belief, ESI's wrongful actions are ongoing.

## XIII.  FIFTH CAUSE OF ACTION

 Reverse False Claims -- Failure to Recoup or Transmit Payment to the Government

129.     Relators re-allege and incorporate the allegations above as if fully set forth herein.

130.     ESI had a contractual duty to recoup or refund funds improperly paid to it or to its retail pharmacies partners, which it failed to do.  ESI knowingly made, or caused to be made, false records or statements material to an obligation to pay or transmit money to the Government.  In the alternative, ESI knowingly concealed or knowingly and improperly avoided or decreased an

obligation to pay or transmit money to the Government.  ESI's actions are false claims under 31

U.S.C. §3729(a)(1)(G).

131.    Based upon information and belief, ESI's wrongful actions are ongoing.

## XIV.  SIXTH CAUSE OF ACTION

### Fraud in the Inducement to be Awarded the TPharm Contract

132.    Relators re-allege and incorporate the allegations above as if fully set forth herein.

133.    The TPharm contract under which the Government paid ESI was procured by fraud.  31

U.S.C. §3729(a)(1)(A) prohibits the knowing submission to a federal employee of a "false or

fraudulent claim for payment or approval."  Having performed under the TRRx and TMOP

contracts and having submitted a comprehensive bid in response to a detailed solicitation with

multiple modifications, ESI knew of the contractual obligations set forth in the TPharm

solicitation, especially as it relates to the awardee's duties to comply with TRICARE cost-

sharing rules and regulations.  ESI knowingly made false statements in its bid to be awarded the

TPharm contract, which were material to the government's decision to award the contract to ESI.

ESI falsely certified to TRICARE that it: 1) was a responsible contractor; 2) was capable of

performing; 3) would deliver all services set forth in the solicitation, statement of work, and the

TPharm contract; and 4) and would comply with all law and regulation applicable to the

execution of the TPharm contract.  ESI fraudulently induced TRICARE to award it the TPharm

contract.

## XIX.   PRAYER

134.    Relator requests the Court to enter judgment against ESI, as follows:

135.    That the United States be awarded damages in the amount of three times the damages

sustained by the United States because of ESI's violations of the FALSE CLAIMS ACT.

136. That the maximum civil penalties be imposed for each and every false claim that ESI presented or caused to be presented.

137. That pre-judgment and post-judgment interest be awarded, along with reasonable attorney's fees, costs, and expenses which the Relators necessarily incurred in bringing and prosecuting this action.

## XX.    RELATORS' INTEREST

138. Relators are entitled to the statutory percentage of the amount received by the United States, reasonable expenses that have been incurred, attorney's fees, and costs. 31 U.S.C. §3730(d).

## XXI.    DEMAND FOR JURY TRIAL

139. Relators request a trial by jury. FED. R. CIV. PROC. 38.

**Attorneys for Relators**

*Dan Hargrove*

By _____

    Daniel Hargrove

**WATERS & KRAUS, LLP**

**Daniel Hargrove**
Texas Bar No. 00790822
600 Navarro St., Floor 5
San Antonio, Texas  78205
(210) 349-0515
(210) 349-3666 (fax)
dhargrove@waterskraus.com

**Charles Siegel**
Texas Bar No. 18341875
**Loren Jacobson**
Texas Bar No. 24050813
**Caitlyn Silhan**
Texas Bar No. 24072879
3219 McKinney Avenue
Dallas, Texas 75204
(214) 357-6244
(214) 357-7252 (fax)
siegel@waterskraus.com
ljacobson@waterskraus.com
csilhan@waterskraus.com

**REILLY POZNER LLP**

**Jason M. Lynch**
1900 Sixteenth St., Suite 1700
Denver, Colorado 80202
(303) 893-6100
jlynch@rplaw.com